UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

DAVID R. HAWKINSON,

Plaintiff,

vs.

VIRGINIA TRZEBIATOWSKI, APNP,
HANNAH UTTER, HSUM,
D. HENNING, R.COTTON, S. BOST, J. KILMER, E. BAKER AND A. DEGROOT,

Defendants.

**DECLARATION OF DEFENDANT VIRGINIA TRZEBIATOWSKI**

Case No. 23 CV 634

---

I, **VIRGINIA TRZEBIATOWSKI**, declare pursuant to 28 U.S.C. § 1746 and under the penalty of perjury, that the following is true and correct.

1. I make this declaration based on my personal knowledge and my review of records kept in the course of regularly conducted activities of the Wisconsin Department of Corrections (Corrections) and Green Bay Correctional Institution (Green Bay Correctional).

2. I am a licensed Advanced Practice Nurse Prescriber ("APNP") and licensed Registered Nurse in the State of Wisconsin.

3. I have been continuously licensed as a registered nurse in the State of Wisconsin since 1985 and licensed as an Advanced Practice Nurse Prescriber since 2006.

4. I am a former employee of Sumo Medical Staffing contracted to provide medical services to inmates at Green Bay Correctional under the guidance of other medical staff and within the confines of the rules and regulations that apply to medical care of inmates. Job duties included evaluation and treatment of patients, documentation of care, and other administrative tasks in the Health Services Unit.

5. I am an APNP, under the general supervision of Dr. Daniel LaVoie. My position does not have control over the schedules of outside specialists.

6. At Green Bay Correctional inmates are not assigned to a single health care provider. This is because providers work differing schedules or may be temporary or seasonal providers. Inmates are seen by the available provider based on scheduling and the clinical urgency of presenting symptoms as reported by the inmate or staff. In this way providers do not necessarily follow each patient, but the Health Services Unit generally follows inmate health care institutionally.

7. Because of how Green Bay Correctional is staffed, providing inmate medical care is not dependent on any one person, and approval of medication, new orders, or referrals are not dependent on any one provider in the Health Services Unit.

8. As an APNP at Green Bay Correctional, I would not always be aware of every inmate's plan of care or concerns about a plan of care unless it was specifically brought to my attention through direct communication. I did not regularly review every patient's medical records until they presented for care.

9. As part of the medical staff at Green Bay Correctional I take into consideration the treatment recommendations of other advanced care providers and physicians at Green Bay Correctional, as well as recommendations of other providers and the patient's health history in making medical decisions and developing care plans for inmates.

10. Green Bay's Health Services Unit ("HSU") can refer inmates to outside providers for care as needed. Outside providers can provide evaluation, diagnosis and treatment plans for inmates with complex or specialized health needs.

11. To prioritize urgent medical needs, HSU providers are not required to follow directions of outside providers given the complex nature of correctional healthcare, as other more pressing needs may warrant different care.

12. An HSU provider desiring to make a referral to an outside provider does so by placing an order and completing an Off-Site Request Form (DOC-3001). Once those tasks are completed, the Medical Program Assistant ("MPA") arranges the appointment with the offsite facility or specialty department.

13. I am aware that the (HSU) has limited control over offsite scheduling. The offsite appointments are scheduled according to the offsite provider's availability along with the institution's transportation availability. Wait times for offsite specialists vary.

14. I had no role in scheduling off-site appointments with outside providers beyond the tasks outlined in #12 above. I would have deferred to the MPA for scheduling off-site appointments unless specifically asked to confirm that the wait time was acceptable in a specific case

15. In my professional capacity at Green Bay Correctional I was generally not aware of which inmates were referred to an offsite provider or what was happening to arrange for the offsite appointment unless the issue was brought directly to me to review.

16. An outside provider may make treatment recommendations to the inmate's treating providers at Green Bay Correctional.

17. A treating advanced care provider in the HSU is not bound by an outside provider's recommendations. The provider may adopt or reject all or portions of the outside provider's recommendations based on the advanced care provider's own medical judgment and other institutional concerns or limitations.

**Nurse Trzebiatowski Treatment and Patient Contact with Hawkinson**

18. I saw Hawkinson for in-person visits a total of four times from 10/15/2021 until 11/02/2022.

19. On October 15, 2021 I saw Hawkinson in person for the first time since his transfer to Green Bay Correctional for complaints of worsening palpitations and swelling of his left leg. At that visit he asked to also discuss a prior concern of neck pain and per standard practice in this setting, he was directed that this visit would specifically address his complaints of palpitations and leg swelling. He did bring up urinary concerns, including hematuria and this was addressed due to the potential for urgent care need.

20. At this visit he requested oxybutynin and changes to his testosterone dosing. Medication changes were ordered to treat his palpitation symptoms and nursing monitoring of his blood pressure was ordered. Education was provided regarding oxybutynin.

21. In December, 2021 I travelled to Florida for an extended four-month stay, and did not work at Green Bay Correctional during that time, until returning in April, 2022.

22. I did not see Hawkinson next until May 13, 2022 for care focused on his blood pressure, Vitamin D level and testosterone therapy. Hawkinson declined a diuretic to treat his leg swelling along with declining metropolol to treat his blood pressure. I informed Hawkinson that I would discuss his request to change to his testosterone dosing schedule with Dr. LaVoie and would look into his request for an ongoing prescription for Vitamin D. Subsequent to that visit he was informed that a referral to Endocrinology would be placed for management of his testosterone therapy. This was made and later cancelled after discussion with Dr. LaVoie.

23. On October 5, 2022, I evaluated Hawkinson for complaints of hemorrhoids, follow-up on Obstructive Sleep Apnea treated with CPAP and complaints of headaches and sciatica. He

reported right groin pain and sciatica although stated his neck the more bothersome concern. He'd previously had an epidural steroid injection and requested another. I made a referral to Prevea Health for those concerns. Hawkinson stated he was sleeping well and in regard to his headache symptoms in the sinus region, he agreed to resume fluticasone. He continued to report intermittent palpitations and when informed that his testosterone therapy could be causative, he opted to stop that part of the conversation. He continued to refuse a beta-blocker as treatment for palpitations. He did note that his leg swelling was reduced with a prescription for amlodipine that was started after he refused metoprolol.

24. On November 2, 2022, I saw Hawkinson for an in-person visit to evaluate near syncopal episodes and his concerns for low blood sugar when he worked in the mornings. His blood pressure was somewhat elevated. An increase in his amlodipine dose was ordered as well as discussion with nursing staff about how to handle caloric intake needs during his work time.

25. As part of my assigned work, I did have occasion to provide care orders for Hawkinson for items that correctional institute practice requires a provider order that oftentimes do not outside of that environment. Examples include orders for COVID swab testing, lab tests such as Vitamin D levels and use of over-the-counter nasal sprays.

26. In late 2022 I returned to Florida for a planned four-month stay, and again was not seeing patients or working at Green Bay Correctional. As of the date of this declaration, I have not returned to work at Green Bay Correctional.

27. Hawkinson alleges that during an evaluation for chest pain and leg edema, he was denied care for neck and back pain which he stated are signs of heart failure. He further alleges that he sought help for pain management for 17+ years, that a "circular" policy system and "cookie cutter answers" were used to delay his receipt of care. He also asserts that he now has heart failure due

to indifference of providers regarding his neck and back complaints, that he has cardiomyopathy caused by an "untreated" blockage of his heart and that he suffers from anxiety, stress, depression and pain and that the DOC continues to "torture" him and that he has been lied to and mislead. (Hawkinson Dec. ¶ 13, Doc. 74.)

28. In response, I did see Mr. Hawkinson for complaints of chest pain and edema of his lower legs at the October 15, 2021 visit and noted that he has recently undergone an extensive cardiac workup for palpitations. At that visit I reviewed prior records from Emergency Room care, an admission for what was diagnosed as atypical chest pain of a noncardiac origin, noting that he had normal results on an echocardiogram, blood work, chest x-ray, telemetry and a nuclear medicine stress test. I noted that his treating cardiologist documented that Hawkinson's reported chest pain was "atypical with low risk pretest probability." During this same visit Hawkinson brought up long-standing urinary symptoms and I addressed those. Finally, he asked for changes to his testosterone dose and his other musculoskeletal issues and I directed that the visit needed to remain focused. I ordered changes to his blood pressure medications to address the leg edema and directed additional nurse monitoring of his blood pressure.

29. Hawkinson was next evaluated by me for complaints of hemorrhoids, headaches, sciatica, neck pain on October 5, 2022. I initiated a referral to Pain Management for his neck pain as he requested another injection. He also mentioned intermittent palpitations but, despite my expressed concern about this medication in view of his cardiac complaints, Hawkinson was not open to discussing the relationship between testosterone and the heart. He reported improvement of his leg edema. Nasal sprays were ordered by me to treat his front sinus pain/headache.

30. At all times during my treatment of Hawkinson I made decisions that were medically indicated based on his presentation and medical history, taking into consideration his medical

needs and documented evaluation and collaborations with other providers. It is my custom, habit, and routine to complete thorough examinations of patients, when cooperative, and give medical recommendations and orders in the best interests of the patient.

31. During my interactions with Hawkinson either in-person or with other HSU colleagues I am aware that he has a known history of multiple requests to change medication, refuse medication, and otherwise attempt to direct his care.

32. At no time during my treatment of Hawkinson or participation in his care did I ignore signs or symptoms of disease or injury or deliberately refuse or fail to provide medical treatment.

***Pursuant to 28 U.S.C. § 1746, I verify under penalty of perjury that the statements in the foregoing declaration are true and correct.***

Executed April 4, 2025

***s/Virginia Trzebiatowski***
**VIRGINIA TRZEBIATOWSKI**