IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

---

DAVID R. HAWKINSON,

Plaintiff,

v. Case No. 23-CV-0634

HANNAH UTTER,
DEREK HENNING,
JENNIFER KILMER,
ELLYN BAKER,
ALAN DEGROOT,
STEVEN BOST,
LARISSA SOQUET YONASH,
RACHEL COTTON,
VIRGINIA TRZBIATOWSKI,
CHRISTOPHER STEVENS,

Defendants.

---

**STATE DEFENDANTS' PROPOSED FINDINGS OF FACT**

---

State Defendants, Hannah Utter, Derek Henning, Jennifer Kilmer, Alan Degroot, Steven Bost, Larissa Cervantes (formerly Soquet Yonash), Rachel Cotton, Ellyn Baker, and Christopher Stevens, by and through their attorneys, Attorney General Joshua L. Kaul and Assistant Attorneys General Pauline Toulouse and Brandon Flugaur hereby submit the following Proposed Findings of Fact in Support of their Motion for Summary Judgment.

**<u>State Defendants and Non-Party</u>**

1. State Defendant Hannah Utter (Utter) is currently employed by Corrections Bureau of Health Services as the Director of Nursing since January 2024.

She was previously an Assistant Director of Nursing from December 2022 to January 2024 and the Health Services Manager (HSU Manager) of the Health Services Unit (HSU) at Green Bay Correctional Institution (Green Bay) from March 2020 to December 2022. Prior to March 2020, she was the Assistant Health Services Manager at Green Bay from March 2018 to March 2020, and a Nurse Clinician 2 at Green Bay from July 2012 to March 2018. She has been continuously licensed as a registered nurse in the State of Wisconsin since July 2011. (Utter Decl. ¶¶ 2-3.)

2. State Defendant Jennifer Kilmer (Kilmer) is currently employed by Corrections as a Nurse Clinician 2 in the HSU at Green Bay. She has worked in this capacity since August 17, 2020. She has been continuously licensed as a registered nurse in the State of Wisconsin since June of 2019. (Kilmer Decl. ¶¶ 2-3.)

3. State Defendant Steven Bost (Bost) was formerly employed by Corrections as a Nurse Clinician 2 in the HSU at Green Bay from February 24, 2014 to February 4, 2022. He has been continuously licensed as a registered nurse in the State of Wisconsin since September 1996. (Bost Decl. ¶¶ 2-3.)

4. State Defendant Derek Henning (Henning) is currently employed by Corrections as a Nurse Clinician 2 in the HSU at Green Bay. He has held this position since April 13, 2020. He has been continuously licensed as a registered nurse in the State of Wisconsin since September of 1993. (Henning Decl. ¶¶ 2-3.)

5. State Defendant Larissa Cervantes (formerly Soquet Yonash or Yonash) formerly worked as a Nurse Clinician 2 in the HSU at Green Bay from July 19, 2021 to March 2025. She has been continuously licensed as a registered nurse in the State

of Wisconsin since January 2019. Since October 2024, she has been licensed in the State of Wisconsin as an Advanced Practice Nurse Prescriber. (Cervantes Decl. ¶¶ 2-3.)

6. State Defendant Rachel Cotton (Cotton) was formerly employed by Corrections as a Nurse Clinician 2 in the HSU at Green Bay from February 28, 2022 to October 31, 2022. From March 27, 2022 to October 31, 2022, she worked weekends at Green Bay. She has been continuously licensed as a registered nurse in the State of Wisconsin since June 2020. (Cotton Decl. ¶¶ 2-3.)

7. State Defendant Ellyn Baker (Baker) was employed by Corrections as a Nurse Clinician 2 (weekends) in the HSU at Green Bay from November 21, 2022, to February 3, 2024. She has been continuously licensed as a registered nurse in the State of Wisconsin since August of 2018. (Baker Decl. ¶¶ 2-3.)

8. State Defendant Alan Degroot (Degroot) is employed by Corrections as an Institution Complaint Examiner (ICE) at Green Bay. (Degroot Decl. ¶ 2.)

9. State Defendant Christopher Stevens (Stevens) is currently employed by Corrections as the Warden of Green Bay. He has served in this capacity since April 23, 2023. (Stevens Decl. ¶ 2.)

10. Non-Defendant Laura Sukowaty (Dr. Sukowaty) is currently employed by Corrections' Division of Adult Institutions, Bureau of Health Services, as an Associate Medical Director (Physician Supervisor), headquartered at Dodge Correctional Institution. She has been employed by Corrections in this capacity since

September 28, 2020. She has been continuously licensed to practice medicine in the State of Wisconsin since February 1995. (Sukowaty Decl. ¶¶ 2-3, 5.)

**Role of HSU Manager**

11. As the former HSU Manager, under the general supervision of the Deputy Warden, Utter's duties included but were not limited to the following: management and supervision of health care services provided to inmates; development of institution-specific procedures; care plan monitoring; report preparation; and serving as a liaison between the HSU, other disciplines and units at the institution, and outside providers. She provided administrative support to staff in the HSU, and she monitored nursing practice documentation in medical records. (Utter Decl. ¶¶ 5, 6.)

12. The HSU Manager provides the overall administrative support and direction of the Health Services Unit while the primary care providers and dentists are responsible for the professional management of medical and dental services. (Utter Decl. ¶ 7.)

13. At times, the HSM may meet with an inmate to discuss their plan of care or to assist nursing staff in staff shortages. But the HSM generally does not evaluate, diagnose, determine a course of treatment for, or prescribe medications for patients. The HSM defers to the decisions of Advanced Care Providers (ACPs) regarding a patient's care, and at all times relevant to this complaint, Utter deferred to Hawkinson's ACPs to determine an appropriate plan of care. (Utter Decl. ¶¶ 8, 12, 13.)

14. ACPs such as physicians and advanced practice nurse prescribers, are responsible for final treatment decisions and care plans. They are also responsible for writing prescriptions, making offsite referrals, and approving the treatment recommendations of offsite providers. (Utter Decl. ¶ 9.)

15. The HSM supervises the nursing staff in the HSU, including licensed practical nurses, registered nurses, and the Medical Program Assistant Associate (MPAA), but the HSM does not supervise ACPs. ACPs work under the supervision of the Medical Director and assigned Associate Medical Director. (Utter Decl. ¶¶ 10, 11.)

**Role of a Nurse Clinician 2**

16. As Nurse Clinicians 2, Kilmer, Bost, Henning, Cervantes, Cotton, and Baker's responsibilities included but were not limited to providing skilled nursing care to patients. This included providing patient assessment and treatment, assisting the physician in providing medical services, management of medications, and provision of emergency care and maintenance of medical records. (Kilmer Decl. ¶ 4; Bost Decl. ¶ 4; Henning Decl. ¶ 4; Cervantes Decl. ¶ 4; Cotton Decl. ¶ 4; Baker Decl. ¶ 4.)

**Role of an Associate Medical Director**

17. As an Associate Medical Director, Dr. Sukowaty is responsible for professional medical services to inmates in accordance with Corrections and Bureau of Health Services policies, procedures and standards. She supervises approximately 14 physicians and nurse practitioners in her region as Associate Medical Director. Along with the Health Services Manager, she meets with the Warden, psychological

services supervisors, security staff in formulating medical policies, operational procedures. She also implements these policies at the unit level. (Sukowaty Decl. ¶ 4.)

## Response to Health Service Requests

18. To obtain non-emergent health care, an inmate patient must submit a Health Service Request form (DOC-3035) to the HSU that contains enough information to apprise the triaging nurse of the issue for which the patient wishes to be seen. (Utter Decl. ¶¶ 14, 15.)

19. Sometimes, patients will use interview/information request forms instead of HSR forms. In these cases, HSU processes interview/information requests in the same way they process HSRs. (Utter Decl. ¶ 16.)

20. HSRs are collected from the housing units daily and are triaged by nursing staff. Nursing staff work to triage all HSRs within 24 hours of receipt. (Utter Decl. ¶ 17; Cotton Decl. ¶ 9.)

21. Nursing staff uses their training and judgment when triaging the HSRs and prioritizing appointments and patient needs. (Utter Decl. ¶ 18.)

22. Nursing staff will schedule a "nursing sick call" appointment for the patient as necessary based on the symptoms reported in the HSR. (Utter Decl. ¶ 19.)

23. Patients describing urgent matters in their HSRs are scheduled for an appointment the same day with a nurse. The nurse may then escalate the appointment with an advanced care provider the same day if warranted. (Utter Decl. ¶¶ 20, 27.)

24. Upon their admission to the institution, patients are informed to alert unit security staff if they believe they have a medical or life-threatening emergency. Security staff will then call or notify HSU. (Utter Decl. ¶ 21.)

25. If the triaging nurse deems the symptoms described in the HSR non-urgent, the patient is scheduled for an appointment as soon as possible thereafter depending on staff availability, urgency of the medical problem, and the number of other patients requiring urgent medical care. (Utter Decl. ¶ 22.)

26. For symptoms that are non-urgent, the triaging nurse may not schedule another appointment if an existing appointment is already scheduled at the time she triages the HSR. (Utter Decl. ¶ 23.)

27. For symptoms that are non-urgent, the triaging nurse may not schedule an appointment if an unscheduled appointment is in the queue to be scheduled at the time she triages the HSR. (Utter Decl. ¶ 24.)

28. The triaging nurse must respond to the HSR in writing. The written response will indicate whether the patient is scheduled to be seen, whether the HSR is referred to another staff member, whether the patient is referred for copies or a record review, or whether education materials are attached. The responder may also provide written comments. (Utter Decl. ¶ 25.)

29. When Hawkinson submitted HSRs or requests to HSU, these HSRs would have been triaged according to policy by nursing staff. In most cases, Utter would not have been made aware of these requests unless she was helping triage HSRs, or the triaging nurse specifically forwarded the HSR to her. (Utter Decl. ¶ 28.)

30. An HSR is forwarded to Utter, if on the HSR form, the box "Refer HSR to" is checked with her name, and she signs the HSR with a response to the patient, and a copy with my response also gets scanned into the medical record. (Utter Decl. ¶ 29.)

**Referrals to Offsite Providers**

31. When an ACP enters an order for a patient to go offsite for a specialty consultation, procedure, or diagnostic imaging (such as an MRI), the order is sent to a scheduling queue maintained by the MPAA. (Utter Decl. ¶ 30.)

32. The HSM monitors the scheduling queue that the MPAA schedules from to ensure the MPAA is scheduling appointments in a timely manner from the queue, but the MPAA is the one who works with the offsite provider's schedule to schedule the appointment for the patient. (Utter Decl. ¶¶ 31, 34.)

33. The MPAA is entirely reliant on the offsite provider's schedule when it comes to scheduling these appointments. Sometimes, appointments may not be available for several months depending on the offsite provider's schedule. (Utter Decl. ¶¶ 32, 118.)

34. There are times when an offsite provider may not be scheduling new patients. There are also times when patients from a correctional setting may not be accepted for an appointment due to the security measures that are necessary for their transport and stay at the offsite clinic or hospital. (Utter Decl. ¶ 33.)

**Nursing Limited Role**

35. Nursing staff at Green Bay are the first point of contact for patient medical issues or concerns. (Utter Decl. ¶ 36.)

36. For symptoms and issues that do not require an evaluation from an ACP, or for symptoms and issues that are not emergent, nursing staff typically work with the patient to rule out simple causes. (Utter Decl. ¶ 37.)

37. Nursing staff do not have the authority to prescribe medications (other than medications noted within the established nursing protocols), refer patients to offsite specialists, schedule appointments with offsite providers, order imaging studies, or override the treatment decision of the ACPs. (Utter Decl. ¶ 38.)

38. Nursing staff do not have the authority to approve special need restrictions, such as a TENS unit. The Special Needs Committee (SNC) does. A nurse can refer a patient's request to the SNC. If the SNC approves the special need restriction, a nurse can enter the approved restriction. Security personnel is then responsible for implementing the special need restriction. (Utter Decl. ¶ 39.)

## Treatment of Hawkinson

39. On August 2, 2021, Hawkinson was seen at BayCare Clinic Pain & Rehab by Dr. Wilkins for neck and right arm pain. Hawkinson history was reported as previously being treated with a cervical epidural steroid injection on June 11, 2021. Hawkinson reported that he received approximately 80% improvement. The completed list of treatments per Hawkinson included heat, ice, bedrest, physical therapy, chiropractic care, exercise, and traction. Dr. Wilkins' assessment was that Hawkinson had cervical stenosis and right upper extremity radiculitis. With the

benefit he received from the cervical epidural steroid injection, Dr. Wilkins recommended that Hawkinson repeat the injection with either Dr. Howson or Dr. Clark at ABMC (Aurora BayCare Medical Center). Hawkinson was instructed to avoid bedrest and to maintain normal activities. Medications remained unchanged. (Utter Decl. ¶ 41; Sukowaty Decl. ¶ 13; Ex. 1005, at 170-173, 207-209.)

40. On August 12, 2021, an order was placed by APNP Trzebiatowski for an appointment to be scheduled with Prevea pain services for a repeat cervical epidural steroid injection. (Utter Decl. ¶ 42; Sukowaty Decl. ¶ 15; Ex. 1005, at 203.)

41. On August 31, 2021, RN Cotton asked MPAA Mapes about the status of Hawkinson's pain service appointment. MPAA Mapes reported that she was waiting for the on-site provider to get back to her regarding where to send Hawkinson. (Utter Decl. ¶ 44; Ex. 1005, at 27-28.)

42. On September 20, 2021, RN Kilmer entered a low bunk/low tier restriction for Hawkinson. The restriction was in place until September 20, 2022. (Utter Decl. ¶ 45; Ex. 1005, at 103.)

43. On September 27 and 28, 2021, MPAA Mapes sent a message to APNP Trzebiatowski informing her that HSU was in the process of transitioning pain service appointments from Aurora to Prevea. The order placed by Dr. Wilkins referred Hawkinson to Dr. Howson at Aurora, however, Hawkinson was not yet established with Dr. Howson. Mapes asked whether Hawkinson could be sent to Prevea. APNP Trzebiatowski responded that Prevea would be fine for the off-site pain services and changed the referral for Hawkinson. (Utter Decl. ¶ 46; Ex. 1005, at 26.)

44. On October 9, 2021 and October 10, 2021, RN Sorenson sent a message to MPAA Mapes asking her to schedule pain services appointment for Hawkinson to have an injection. MPAA Mapes responded the following day, informing RN Sorenson that a referral was faxed to off-site provider for pain services. Mapes was waiting for the off-site provider to review the paperwork and call to schedule the appointment. (Utter Decl. ¶¶ 47, 48; Ex. 1005, at 24-25.)

45. Hawkinson was evaluated by a Physical Therapist on October 21, 2021 for his neck and back pain. He thereafter received physical therapy on November 15, 2021. (Utter Decl. ¶ 49; Ex. 1005, at 122-125.)

46. On November 11, 2021, Hawkinson submitted a HSR to HSU asking why he had not received an injection in his neck. RN Bost responded to this HSR informing him that pain management was coming back on-site so appointments were getting caught back up. (Utter Decl. ¶ 50; Ex. 1005, at 201.)

47. On November 12, 2021, Dr. Rojas placed an order for duloxetine 20 mg which was good until September 5, 2022. (Utter Decl. ¶ 51; Ex. 1005, at 114.)

48. On November 12, 2021, MPAA Mapes placed a note in Hawkinson's chart stating that after she faxed the pain services order to Prevea, she received a phone call from a nurse stating that their off-site provider does not perform the cervical epidural steroid injection that Dr. Wilkins ordered. Mapes was advised to fax the order to Aurora and was waiting for a phone call from Aurora to get the appointment scheduled. Mapes also noted that it may be scheduled outside of the 12-

week timeframe. This note was reviewed by APNP Trzebiatowski that same day with the comment, "Ok, thank you." (Utter Decl. ¶ 52; Ex. 1005, at 45.)

49. On December 8, 2021, Hawkinson submitted a HSR to HSU asking why he had not received the injection in his spine for his pain. RN Bost responded informing him that he had an appointment scheduled within the next 2 weeks. (Utter Decl. ¶ 53; Ex. 1005, at 200.)

50. On December 21, 2021, Hawkinson was transported off-site to pain services at Aurora where he had a cervical injection for his cervical pain. At the end of this visit, no specific follow-up was ordered. (Utter Decl. ¶ 54; Sukowaty Decl. ¶ 17; Ex. 1005, at 158-169.)

51. An offsite provider that deems it necessary to see a patient again will state so on the patient's offsite report. Absent any such note, HSU staff can assume that the offsite provider does not deem a follow-up necessary, and therefore no further scheduling action is necessary. (Utter Decl. ¶ 114.)

52. The indication for return would be based on his Corrections providers' assessment and a need to send him back to the specialty providers. (Utter Decl. ¶ 115.)

53. On December 23, 2021, Hawkinson was seen by RN Henning for complaints of neck spasms and a "snap" in his back the day prior. RN Henning reported that Hawkinson walked to HSU with a steady gait and was in no acute distress. He also held his neck and back straight while walking. RN Henning noted Hawkinson had an epidural steroid injection on December 21. The spasms were below

the injection site. Hawkinson reported his neck felt better since the injection, his right thumb was no longer tingling, his left thumb was tingling, and he had back pain below the injection site. RN Henning explained that there can be pain/discomfort for usually 2 to 3 days but can last up to 1 week following an injection. Hawkinson was to continue using Tylenol and naproxen, only do soft stretches and use positions of comfort. RN Henning also informed him that he had an ACP follow-up scheduled for January 17, 2022, although the appointment actually took place on January 24, 2022. (Utter Decl. ¶ 55; Ex. 1005, at 11-17.)

54. On January 19, 2022, Hawkinson submitted a HSR to HSU stating "I need help with my back. I am doing all the treatments I am able. Whatever is wrong needs to be treated as a whole. The pain is causing psychological problems. Why can't I get treatment?" Nurse Henning responded to this HSR informing him that he had an appointment with his ACP on January 24, 2022. (Utter Decl. ¶ 56; Ex. 1005, at 202.)

55. On January 24, 2022, APNP Wachholz saw Hawkinson for several issues. For cervical pain, he reported improvement in neck pain following a cervical injection, though the pain was persistent to a lesser degree. During this visit, he dismissed his neck pain and focused instead on his thoracic pain. She ordered a follow-up in 6 months. No new orders were placed for pain management. (Utter Decl. ¶ 58; Sukowaty Decl. ¶ 18; Ex. 1005, at 42-45, 87.)

56. On February 2, 2022, Hawkinson submitted a HSR to HSU stating, "I need help with my back. The T2-T3 area is killing me. The treatments for my neck

are not working on the thoracic pain. HELP!" Bost responded to this HSR informing him that he had a pending appointment with his provider for his back pain. (Bost Decl. ¶ 7; Utter Decl. ¶ 59; Ex. 1005, at 199.)

57. "Pending" meant that Hawkinson was on a waiting list to be seen. At the time of RN Bost's response, the appointment was in the scheduling queue but it did not have a specific date yet because it was not scheduled yet. That is why Bost informed Hawkinson that an appointment was "pending." (Bost Decl. ¶ 8; Utter Decl. ¶ 60.)

58. As a Nurse Clinician 2, Bost is not responsible for scheduling those appointments. The MPAA is. (Bost Decl. ¶ 9.)

59. On March 17, 2022, Hawkinson submitted an HSR to HSU stating, "When am I due for another shot in my neck? The pain is creeping back, 5+ all the time with periods of 10. (short periods) so far." On March 18, 2022, Kilmer responded to this HSR informing him that there was no order for a neck injection at that time. (Kilmer Decl. ¶ 6; Decl. ¶ 61; Ex. 1005, at 1.)

60. At that time, Kilmer also added his neck pain concerns to an already existing appointment so that his pain concerns could be further assessed. This appointment was with RN Derek Henning on March 24, 2022 for Vitamin D for a pituitary issue. (Kilmer Decl. ¶ 7; Ex. 1005, at 210.)

61. RN Kilmer's answer to Hawkinson was appropriate, as she was answering his question. The offsite clinic did not recommend a follow-up therefore

she informed him there was not an order for another injection at that time. (Utter Decl. ¶ 62.)

62. During May of 2022, Hawkinson was being treated for numerous other concerns by APNP Trzebiatowski. Pain concerns were not a topic during the May 13, 2022 appointment. He did not bring up his neck pain. (Utter Decl. ¶ 64; Sukowaty Decl. ¶ 19; Ex. 1005, at 40-42.)

63. On June 2, 2022, Hawkinson submitted a HSR to HSU stating, "Why did you change my Naproxen prescription? This was for the pain in my arm shoulder and neck all of which will never heal, but it is getting worse. Please Refer to MRI of cervical spine." Nurse Henning responded to this HSR informing him that the change in Naproxen was changed due to DOC pharmacy new standards. (Utter Decl. ¶ 65; Ex. 1005, at 198.)

64. On July 18, 2022, Hawkinson submitted a HSR to HSU stating, "I need another shot in my neck nothing is helping again." Nurse Henning responded to his HSR informing him that he had an ACP referral in place pending scheduling and that if he needed a RN sick to let HSU know. (Utter Decl. ¶ 66; Ex. 1005, at 197.)

65. The order was entered on January 24, 2022 by APNP Wachholz. The appointment was for 6-month follow-up for Mr. Hawkinson's headache, obstructive sleep apnea (OSA), CPAP, and sciatica. The appointment was "due" July 24, 2022, but was not scheduled and completed until October 5, 2022. (Utter Decl. ¶ 67; Ex. 1005, at 80.)

66. On August 5, 2022, Hawkinson submitted a HSR to HSU stating, "I Do Not need a sick call, you already have MRI showing I have a condition that will never heal and will need constant treatment. If it is $7.50 you need, take it and send me for the epidural in my cervical spine." Although this HSR is dated August 5, 2022, Nurse Cotton received it on September 6, 2022. At that time, Nurse Cotton responded to this HSR informing Hawkinson that, as noted on a letter sent to him on August 26, 2022, the provider had ordered a referral to Pain Services. (Utter Decl. ¶ 68; Ex. 1005, at 180-181, 196.)

67. On August 25, 2022, RN Hartjes sent a message to APNP Trzebiatowski stating that Hawkinson had inquired about a cervical injection which he had not had in a few months and that she could not see anything on the schedule or waiting to be scheduled. The next day, APNP Trzebiatowski asked RN Hartjes to inform Hawkinson that the last follow-up pain service visit from December 2022 did not advise that a follow-up visit was recommended. She entered the order for him to be put on the waiting list to transition to Prevea pain services. (Utter Decl. ¶ 69; Sukowaty Decl. ¶ 20; Ex. 1005, at 22-23.)

68. On August 26, 2022, a letter was provided to Hawkinson stating, "HSU spoke with your ACP and according to records from 12/22 the last pain note noted that a need for follow up was not advised. The ACP is willing to put in an order in to be placed on the wait list to transition to Prevea Pain Service. If you have any further questions let HSU know. Health Services Unit Staff" (Utter Decl. ¶ 70; Ex. 1005, at 180-181.)

69. On September 1, 2022, Dr. Rojas placed an order for duloxetine for Hawkinson which was good until August 16, 2023. (Utter Decl. ¶ 71; Ex. 1005, at 110.)

70. On September 6, 2022, Cotton received and responded to an HSR from Hawkinson. In it, he wrote "I Do Not need a sick call, you already have MRI showing I have a condition that will never heal and will need constant treatment. If it is $7.50 you need, take it and send me for the epidural in my cervical spine." Cotton responded to this HSR informing him that, "as noted on a letter sent to him on August 26, 2022, the provider had ordered a referral to Pain Services." (Cotton Decl. ¶ 7; Ex. 1005 at 196.)

71. Although Hawkinson appears to have written "August 5, 2022," on this HSR, Cotton did not see it until September 6, 2022. Just because a patient writes a certain date on an HSR does not mean that it was actually written on that date. (Cotton Decl. ¶¶ 8, 10.)

72. On October 5, 2022, Hawkinson was seen by APNP Trzebiatowski for numerous issues including CPAP, sinus, headaches, hypertension, bilateral lower leg edema, sciatica, heart palpitations, testosterone. During this visit, Hawkinson reported that he had recently asked the nursing staff about a follow-up on his neck pain and wanted to have another injection. APNP Trzebiatowski advised him that he had an appointment with Prevea pain services in the next few weeks. (Utter Decl. ¶ 72; Ex. 1005, at 37-39, 80.)

73. On October 14, 2022, Hawkinson was transported to the on-site pain services for cervical pain where he saw an APNP. The APNP's recommendation was to repeat cervical injection. (Utter Decl. ¶ 73; Ex. 1005, at 155.)

74. On October 21, 2022, Hawkinson was scheduled to see his ACP, but due to security issue/institution issue, he was unable to be seen. (Utter Decl. ¶ 74; Ex. 1005, at 21.)

75. On October 26, 2022, Prevea sent a fax to RN Kilmer stating that they recommended a referral to Bellin for a cervical injection. (Utter Decl. ¶ 75; Ex. 1005, at 156-157.)

76. On November 4, 2022, Hawkinson submitted two HSRs to HSU asking why he had not received his epidural for pain. RN Kilmer responded informing him that an injection was ordered and pending scheduling. (Utter Decl. ¶ 76; Ex. 1005, at 195.)

77. On November 20, 2022, Hawkinson submitted an HSR stating "I would like my TENS unit back, I feel like I am dying." Nurse Baker responded, "Tens unit ordered [sic] expired forward to special needs." (Utter Decl. ¶ 77; Ex. 1005, at 194.)

78. On December 7, 2022, Hawkinson submitted a HSR to HSU stating, "I feel that HSU is intentionally delaying my epidural and this is causing me agonizing pain on a daily basis. This is causing depression and other mental problems. Why have I not received my epidural[?]" Nurse Henning responded to this HSR informing him there was a referral in place and it was pending scheduling. Nurse Henning also

stated that he had an appointment scheduled to see his ACP on December 22. (Utter Decl. ¶ 78; Ex. 1005, at 193.)

79. On December 21, 2022, Hawkinson directed an Information Request to Utter. In it, Hawkinson stated, "I am having a problem with my neck and back. It is causing me agonizing pain. As of the 22nd of December it will be one year since my last epidural. A shot I am supposed to get every three months. Every time I write HSU it is always the same answer, you have an appointment coming up. In the meantime, it is getting worse. I have had to go on antidepressants because of the pain. Some days it is so bad all I do is go to the bathroom and eat. Please tell me what is going on, and why it is taking so long?" Utter did not see or respond to this Information Request. Nurse Henning responded to this Information Request by letting Hawkinson know that as of December 5, 2023, Utter was no longer the HSM. Henning also responded that HSU was at the mercy of outside provider schedules which had switched to Prevea Pain Services. (Utter Decl. ¶ 79; Ex. 1005, at 191-192.)

80. On December 25, 2022, Hawkinson filled out an HSR stating that he wanted to go back on seizure medication. He added that he was having them more frequently because of the increased stress. Nurses L. Yonash and E. Baker responded that he may discuss restarting his medication with his provider. They also responded that he had an appointment scheduled on January 26 with his ACP and that his next psychiatric appointment was in four to six weeks. (Utter Decl. ¶ 80; Ex. 1005 at 190.)

81. On December 27, 2022, Bellin Hospital pain services responded to MPAA Mapes regarding her request for a cervical injection, stating that they needed

a diagnosis code, and they needed to verify whether Hawkinson had ever done physical therapy for his neck pain. (Utter Decl. ¶ 81; Ex. 1005, at 154.)

82. On January 3, 2023, Green Bay asked for additional information. (Sukowaty Decl. ¶ 21.)

83. On January 10, 2023, MPAA Mapes placed a note in Hawkinson's chart stating she had spoken with a nurse at Bellin Hospital to get an appointment scheduled for pain services for his cervical injection. The nurse at Bellin Hospital advised MPAA Mapes that an injection could not be scheduled because Hawkinson needed to have physical therapy for at least four weeks prior. Bellin Hospital provided a letter stating the same. At this time, the pain service appointment had not been scheduled. (Utter Decl. ¶ 83; Sukowaty Decl. ¶ 22; Ex. 1005, at 36, 153.)

84. On January 28, 2023, Hawkinson submitted a HSR to HSU stating, "When I Lay Down there is pain between my shoulder blades around T2-T3, T3-T4. My hands hurt. My right arm hurts. Right now it hurts to write this." RN Baker responded to this HSR informing him that he had a provider appointment on February 10 and asked if he needed to be seen sooner. (Utter Decl. ¶ 84; Ex. 1005, at 189.)

85. On February 10, 2023, Hawkinson was seen by Dr. Daughtry for cervical pain, low back pain, and low testosterone. Dr. Daughtry noted that Hawkinson had a history of cervical radiculopathy with numbness in both hands at night. He works doing sewing at BCI. He takes naproxen and tylenol. He has an order to get a cervical injection with Dr. Yeatman. He is on duloxetine which helps some. He had a neck

injection in December 2021 at Baycare. He was supposed to get an injection at Bellin Hospital but they were asking for more physical therapy of the neck first. He had several other neck injections in the past. He also had upper back pain. Dr. Daughtry placed an order for celecoxib until January 20, 2024, and he also ordered an x-ray of the thoracic spine due to Hawkinson's upper back pain. (Utter Decl. ¶ 85; Ex. 1005, at 33-35, 80, 108, 118.)

86. On February 16, 2023, the Hospital Sisters Health System faxed a response stating that Hawkinson will need an MRI within the last 6 months per the radiologist protocol. (Utter Decl. ¶ 86; Ex. 1005, at 150-153.)

87. On February 20, 2023, RN Kilmer spoke with Dr. Malo from Prevea Pain Services who stated Hawkinson needed to have an updated cervical MRI before he could have an epidural steroid injection (ESI). (Utter Decl. ¶ 87; Ex. 1005, at 20.)

88. On February 20, 2023, the request was changed back to Prevea. (Sukowaty Decl. ¶ 23; Ex. 1005, at 148-149.)

89. On February 21, 2023, a nurse from Prevea sent a fax to RN Kilmer after RN Kilmer had requested a cervical injection for Hawkinson's neck pain. The nurse stated that since Hawkinson's MRI was from February 23, 2021, they would recommend a repeat of the MRI prior to the injection because many changes can occur in 1 year. (Utter Decl. ¶ 88; Ex. 1005, at 147-150.)

90. Prevea providers work out of the Hospital Sisters Health System. The note from February 21, 2023 states that the provider at Bellin who Hawkinson was referred to by APNP Schmeling, would not do the injection, which is why he was then

recommended to go to a Prevea provider through IR (interventional radiology). (Utter Decl. ¶ 89; Ex. 1005, at 147-150.)

91. On February 24, 2023, Hawkinson had an x-ray of his thoracic (upper) back. On March 7, 2023, a letter was sent to Hawkinson stating, "Your x-ray of the lumbar spine showed some narrowing of the discs between the vertebrae. It was otherwise normal." (Utter Decl. ¶ 90; Ex. 1005, at 118, 182.)

92. On March 8, 2023, Hawkinson submitted a HSR stating, "I still have extreme pain in both arms, hands, and neck. I have not received my injection for pain. What is going on?" RN Henning responded to this HSR informing him that he was scheduled for a cervical MRI that month before his epidural steroid injection. (Utter Decl. ¶ 91; Ex. 1005, at 188.)

93. On March 12, 2023, Hawkinson submitted an HSR stating, "Pain, Bad, HELP!" Nurse Baker responded asking that he specify what he needed to be seen for, and that specifics help to schedule him appropriately. That same day, Hawkinson submitted another HSR stating that his hands were not working appropriately, and his right arm was swelled up. Nurse Baker responded that he was scheduled to be seen in the HSU. (Utter Decl. ¶ 92; Ex. 1005 at 186-187.)

94. On March 28, 2023, Hawkinson had a cervical MRI at Hospital Sisters Health System. (Utter Decl. ¶ 94; Sukowaty Decl. ¶ 24; Ex. 1005, at 175-179.)

95. On April 21, 2023, Hawkinson saw Dr. Daughtry for a follow-up of his testosterone, cervical radiculopathy, and seizure disorder. For his cervical pain, Dr. Daughtry noted that there was a cervical injection pending. For medication,

Hawkinson would resume Celebrex after the injection. Dr. Daughtry placed an order for acetaminophen 500 mg, with a follow-up in 3 months. (Utter Decl. ¶ 95; Ex. 1005, at 31-33, 69,106.)

96. On April 26, 2023, Hawkinson was transported to St. Vincent Hospital where he received a cervical injection for his cervical pain. St. Vincent Hospital is within the Hospital Sisters Health System. (Utter Decl. ¶ 96; Sukowaty Decl. ¶ 25; Ex. 1005, at 128-146.)

97. On April 26, 2023, Hawkinson was seen by RN Kawalski and reported no pain or side effects related to his pain injection. (Utter Decl. ¶ 97; Ex. 1005, at 18-19.)

98. On April 30, 2023, Hawkinson submitted a HSR to HSU asking for an explanation of his MRI. He also stated that the epidural steroid injection "worked pretty good on my neck." He asked if there was a diagnosis of his neck. RN Henning responded to this HSR by advising him to discuss his concerns/questions with his provider at his next scheduled appointment. (Utter Decl. ¶ 98; Ex. 1005, at 185.)

99. On May 6, 2023 (a Saturday), Hawkinson was seen by RN McNeel after receiving a call from security that he was asking for a walker due to complaints of back pain. He stated that he was reaching for a paper and felt something pull in his back. He reported having an MRI of his back in 2019 or 2020 and that he has a herniated disc sciatica. He stated that this had happened before and that he just needed a walker to help him get to and from the bathroom. He wanted to go back to work on Monday. RN McNeel provided him with a walker to use over the weekend.

She explained to him that he would need to be assessed before returning to work and to return the walker. She told him to continue to use his available medication and rest with proper body mechanics for slow transfer in positioning. RN McNeel spoke with Correctional Officer Paape and informed him that Mr. Hawkinson was not to work until he was assessed by HSU in two days which she placed in WICS. (Utter Decl. ¶ 99; Ex. 1005, at 2-10.)

100. On May 8, 2023, Hawkinson was seen by RN McNeel as a follow-up to the need for the walker. She reported that he ambulated to HSU with a steady even gait and was in no acute distress. Hawkinson stated that he no longer needed the walker and wanted to return to work. She explained that he was only taken off work until the next morning and that he could return to work. He inquired about when he would see the provider for his low back pain, and she explained that the referral/order to see the provider had been entered but that it was not scheduled as of that visit. (Utter Decl. ¶ 100; Ex. 1005, at 18.)

101. On May 17, 2023, Dr. Daughtry saw Hawkinson for complaints of low back pain and upper back. Hawkinson reported having some pain in his upper back. He was taking Celebrex which he reported was helping temporarily and he had lidocaine cream. He had a recent epidural injection in his cervical spine and stated his neck pain was improved. For his upper back pain, Dr. Daughtry ordered methocarbamol 750 mg 2 times daily for 3 weeks for muscle spasms. For his cervical pain, he was to follow-up with pain services. (Utter Decl. ¶ 101; Ex. 1005, at 29-31, 65, 105.)

102. On June 4, 2023, Hawkinson submitted a HSR to HSU directed to Dr. Daughtery stating he had changed his mind about nortriptyline and that he wanted to start on it for his pain. RN Kilmer responded to this HSR informing him that he may discuss this the next time he saw his ACP. (Utter Decl. ¶ 102; Ex. 1005, at 184.)

103. On June 21, 2023, Hawkinson submitted a HSR to HSU asking if there was a physical therapy order. RN Henning responded to this HSR informing him that that there was a physical therapy order. (Utter Decl. ¶ 104; Ex. 1005, at 183.)

104. On August 11, 2023, Hawkinson was transported off-site to the pain services for a follow-up for his neck pain and complaints of low back pain. He was seen by an APNP who recommended (1) a cervical epidural steroid injection, (2) an increase of the duloxetine to 60 mg, (3) a lumber spine MRI, and (4) a TENS unit for the low back pain. (Utter Decl. ¶ 105; Ex. 1005, at 127.)

105. For Hawkinson's low back/lumbar pain, he was seen on August 17, 2021, October 21, 2021, January 24, 2022, and February 10, 2023. He also had a lumber spine x-ray on February 24, 2023, and he received physical therapy on October 21, 2021 and on November 15, 2021. He also received a TENS unit to assist with sciatica pain that was in effect from November 1, 2021 through April 30, 2022, and from August 11, 2023 through August 10, 2024. He was to perform home exercises. (Utter Decl. ¶ 106; Ex. 1005, at 33-34,42-48, 102-103, 116-117, 119, 122-126, 174.)

106. Physical therapy was again ordered at the institution, with Hawkinson minimally participating in the home exercise program. (Sukowaty Decl. ¶ 16; Ex. 1005, at 121-125.)

## Expert Opinion

107. In Dr. Sukowaty's opinion and based on her professional training and expertise, Hawkinson did not suffer any additional or separate harm as a result of any alleged delay in obtaining him an epidural steroid injection to his neck/back. (Sukowaty Decl. ¶ 27.)

108. Epidural steroid injections are meant to lessen the pain. They do not actually treat the underlying cause, other than decrease the inflammation around the nerves. The only definitive improvement for the root cause of the pain is surgery. The pain management specialists did not recommend that the patient see neurosurgery. (Sukowaty Decl. ¶ 28.)

109. Hawkinson was seen by Corrections' providers and nurses regularly, and had physical therapy, anti-inflammatories and muscle rubs ordered. He was ordered lidocaine topical from January 21, 2022 to January 12, 2023; January 3, 2023 to July 1, 2023; and June 27, 2023 to June 16, 2024. He was ordered acetaminophen from August 26, 2021 to April 21, 2022; April 7, 2022 to March 27, 2023; and March 14, 2023 to February 5, 2024. He was also ordered naproxen until February 23, 2023. (Sukowaty Decl. ¶¶ 10, 11; Ex. 1005, at 29-31, 33-35, 46-101, 104, 105, 107-109, 111-113, 115, 116-120, 122-126, 174.)

## Hawkinson's Inmate Complaints

110. As the ICE, Degroot investigates inmate complaints that are filed by inmates using the Inmate Complaint Review System (ICRS). (Degroot Decl. ¶ 4.)

111. Upon completion of Degroot's investigation of an inmate complaint, he issued a recommendation to the Reviewing Authority (RA) who then decides the inmate complaint. (Degroot Decl. ¶ 8.)

112. Degroot's recommendation to the RA can be to affirm the inmate complaint, or to dismiss it. (Degroot Decl. ¶ 9.)

113. The RA is not required to follow Degroot's recommendation and uses his or her judgment in deciding an inmate complaint. (Degroot Decl. ¶ 10.)

114. Degroot recommends affirmance of an inmate complaint when the inmate meets filing requirements, and sufficient proof exists as to the inmate's allegations. (Degroot Decl. ¶ 11.)

115. Degroot recommends dismissal of an inmate complaint when the inmate meets filing requirements, and there is insufficient proof as to the inmate's allegations. (Degroot Decl. ¶ 12.)

116. When making a recommendation to the RA, Degroot relies on the inmate complaint and the results of his investigation. This includes his communication with relevant staff such as the subject-matter experts, their responses, and his review of relevant records. (Degroot Decl. ¶¶ 14, 15.)

117. For complaints regarding medical care, the subject-matter experts include the Assistant Health Services Manager (AHSM) and the Health Services Manager (HSM). On occasions, Degroot may also consult a registered nurse. (Degroot Decl. ¶ 16.)

118. Degroot reviewed Exhibits 1000 to 1003, which are attached to the

declaration of Emily Davidson. (Degroot Decl. ¶ 17; Dkts. 61-1; 61-2; 61-3; 61-4.)

119. Degroot recommended a dismissal of GBCI-2021-15929 and GBCI-2023-257 because his investigation revealed that Hawkinson's concerns were being properly addressed. (Degroot Decl. ¶ 19; Dkt. 61-2:2; Ex. 1001 at 2; Dkt. 61-3:2; Ex. 1002 at 2.)

120. Degroot did not recommend a dismissal of GBCI-2023-9773. ICE Z. Paul recommended a dismissal of that complaint. (Degroot Decl. ¶ 18; Dkt. 61-4:2; Ex. 1003 at 2.)

121. If an inmate complains that a specific treatment is not being offered, Degroot defers to the judgment of the AHSM or HSM. What type of specific care or treatment must be offered is a matter of professional medical judgment. Degroot is not a health care professional. (Degroot Decl. ¶ 21.)

122. If an inmate complains about treatment delay, Degroot discusses the inmate's treatment history with the AHSM. The AHSM can review the inmate's medical file to assist in his investigation. (Degroot Decl. ¶ 22.)

123. As the ICE, Degroot's role is limited to the investigation of an inmate complaint and making a recommendation to the RA. Degroot does not have the authority to affirm or dismiss an inmate complaint. (Degroot Decl. ¶ 25.)

124. The RA's decision can be appealed and reversed or appealed and affirmed. (Degroot Decl. ¶ 26.)

125. An inmate who is dissatisfied with an RA's decision can appeal that decision to the Corrections Complaint Examiner (CCE). The OOS then issues a final

decision. (Degroot Decl. ¶ 27.)

126. On February 2, 2023, Utter acted as the Reviewing Authority on GBCI-2023-257, which is an inmate complaint Hawkinson filed alleging delayed medical care for his neck and back. (Dkt. 61-3; Utter Decl. ¶ 108.)

127. On February 13, 2023, Utter dismissed this complaint because her review of his treatment history revealed that he completed injections at Aurora in December 2021. At that time, they recommended follow-up with his Corrections provider. Hawkinson was then seen May 2022 for unrelated issues, and in October 2022 for a follow-up on the neck pain. He was referred to Prevea Pain Services who GBCI has a contract with, however, Prevea referred him to Bellin in October 2022 for an injection, and Bellin then would not see him unless he completed Physical Therapy for his neck first. Hawkinson then saw his new DOC provider, Dr. Daughtry, on February 10, 2023 and had a pending appointment with Interventional Radiology for an injection. Although he stated that GBCI failed to schedule him for his injection, the medical record revealed that he had been seen and referred out as indicated. (Dkt. 61-3:3; Utter Decl. ¶ 109.)

128. On August 3, 2023, Utter acted as the Reviewing Authority on GBCI-2023-9773, which is an inmate complaint Hawkinson filed regarding his medical care. He alleged that on July 2, 2023 at approximately 6:30 PM, HSU was delaying and denying him medical care. (Dkt. 61-4; Utter Decl. ¶ 110.)

129. On August 8, 2023, Utter dismissed this complaint because her review of his treatment history revealed that EMG orders were discontinued, therefore there

was not a delay in scheduling those. Additionally, a follow-up with Pain Services was pending to discuss his chronic pain and plan of care. The provider did not mention the EMG in the last two provider notes on pain. Physical therapy was also pending. (Dkt. 61-4:3; Utter Decl. ¶ 111.)

**Correspondence**

130. On July 10, 2023, Stevens was forwarded and received a communication from Hawkinson stating:

> I am having severe Back and Neck pain. The medical care here is avoiding giving me the proper medical treatment and it is steadily getting worse. I filed an inmate complaint and it was affirmed up on appeal. I am currently involved in a 1983 for this matter. Now the medical services are doing the same thing again and they have not complied with the first Inmate complaint. I am in EXTREME pain. I am suffering! It is getting worse!

(Stevens Decl. ¶ 5; Ex. 1006 at 2.)

131. On July 13, 2023, Stevens responded to Hawkinson's correspondence informing him as follows:

> Your correspondence received July 10, 2023 by the Governor's Office regarding medical care at GBCI has been received and referred to my office for response.
>
> A review of the ICTS reveals you have already raised these issues through the filing of inmate complaints. Your appeal for GBCI-2023-257 has been reviewed by the CCE Office and final decision has been issued by the Office of the Secretary. Additionally, inmate complaint GBCI-2023-9773 is currently being investigated and I would ask that you allow the ICE office to complete the process. You will be notified when a decision is made. If you are not satisfied with the response you receive regarding your complaint, you have the option to file an appeal with the Corrections

> Complaint Examiner's office in Madison within 14 days after the date of the decision by completing DOC-405.
>
> As you have exhausted your administrative remedies this issue will not be addressed again through this office.

(Stevens Decl. ¶ 7; Ex. 1007.)

132. On August 14, 2023, Stevens' office received an Information Request from Hawkinson which was directed to him. The Information request was dated August 10, and stated:

> Let this serve as notice of you and your staff participating in a civil conspiracy to deprive me of my 8th Amendment right and my 14th Amendment right. Notice will also be sent to the Governor. My medical needs are not being met. I am in pain and your minions are manipulating policies and procedures to make it look as if I am scheduled for an appointment. I have already completed the ICE process once and I am in court. Let this also include your Deputy Warden also.

(Stevens Decl. ¶ 9; Ex. 1008.)

133. On August 24, 2023, Stevens responded to Hawkinson's Information Request informing him as follows:

> This memo is in response to your correspondence received August 14, 2023 wherein you state you are putting Administration on notice for violating your 8th and 14th amendments, particularly as it relates to treatment of your medical conditions.
>
> A review of the ICTS reveals you have already filed an inmate complaint on this issue (GBCI-2023-9773). Your appeal has been reviewed by the CCE Office and final decision is pending by the Office of the Secretary. As you have exhausted your administrative remedies this issue will not be addressed again through this office.

> In your correspondence, you reference staff members as being "minions" who are "manipulating policies and procedures". Mr. Hawkinson, I encourage you to use caution when making references regarding other individuals in the future as this type of derogatory language and communication will not be tolerated. You have violated DOC 303.29 Disrespect and may be subject to discipline.

(Stevens Decl. ¶ 11; Ex. 1009.)

**Claims**

134. Stevens became aware of Hawkinson's allegations of delayed care through the correspondence Hawkinson sent to him. (Stevens Decl. ¶¶ 13-15.)

135. Based on Hawkinson's July 10, 2023 correspondence, Stevens understood that Hawkinson alleged a pattern of delayed care. Stevens saw that the final decision for GBCI-2023-9773 was pending, therefore he advised Hawkinson to wait for the ICE Office to complete the review process through the ICRS. (Stevens Decl. ¶¶ 14-17.)

136. Because these complaints already existed in the ICRS, there was not a reason to address them again through Stevens' office since the ICRS exists precisely to address the type of complaints Hawkinson raised through his July 10, 2023 correspondence to Stevens. (Stevens Decl. ¶¶ 18, 19.)

137. As the Warden, Stevens is responsible for the health and safety of the inmates under his care. This means if he is made aware of concerns regarding health and safety, he will ask the relevant area supervisor to follow on the concern(s). (Stevens Decl. ¶ 22.)

138. However, Stevens does not schedule appointments, and he does not have the authority to direct the care of inmates. Because he is not a health care professional, he defers all decisions regarding patient care to the inmate's treating team. This means the nurses and Advanced Care Providers (ACPs) for treatment decisions, and the MPAA for scheduling. (Stevens Decl. ¶¶ 23-25, 3.)

139. Some scheduled medical procedures take place at hospitals. Stevens does not order inmate transport or alternate transport to such medical appointments. Planned transports to an offsite provider are coordinated by the Scheduling Lieutenant, and the decision to send an inmate to the hospital is made by a nurse or an ACP. (Stevens Decl. ¶¶ 26-28.)

140. In the event of an emergency, transport arrangements to the hospital are done by the security supervisor on shift. A security supervisor may be a captain or a lieutenant. (Stevens Decl. ¶ 29.)

141. Stevens talks with Human Resources weekly to ensure they are recruiting for all vacant positions at Green Bay. Stevens ensures they do ongoing recruitment to fill all positions. (Stevens Decl. ¶ 30.)

142. Stevens is not responsible for the staffing of nursing and ACPs. The BHS Director determines those staffing needs. (Stevens Decl. ¶¶ 30, 31.)

143. Stevens was not working at Green Bay from December 2021 to April 2023. Stevens is unaware of any nursing or ACP shortage during that time. (Stevens Decl. ¶ 32.)

144. HSU and BHS have no control over staff decision to resign or to transfer to another institution. Staff employment at Green Bay is at-will. (Stevens Decl. ¶ 33.)

145. Stevens, DeGroot, and Utter did not cause or participate in the violations which are alleged by Hawkinson. (Stevens Decl. ¶ 34; Degroot Decl. ¶ 24; Utter Decl. ¶ 122.)

146. As the Warden and ICE, respectively, Stevens and Degroot lack any implementation authority on an affirmed complaint. (Stevens Decl. ¶ 20; Degroot Decl. ¶ 28.)

147. Typically, the relevant Unit or Department named in an affirmed inmate complaint is responsible for bringing redress. Even so, their ability might be limited by factors outside of their control. For instance, if an inmate complains that his offsite appointment is scheduled too far out, that scheduled date might not be changeable due to the offsite provider's schedule, which DOC has no control over. (Stevens Decl. ¶¶ 20, 21; Degroot Decl. ¶¶ 29, 30.)

148. Utter, Kilmer, Bost, Henning, Cervantes, Cotton, Baker, DeGroot are not aware of any failure by APNP Virginia Trzebiatowski to complete offsite paperwork for Hawkinson, resulting in a delay in receiving an epidural injection for his pain. (Utter Decl. ¶ 119; Kilmer Decl. ¶ 8; Bost Decl. ¶ 10; Henning Decl. ¶ 7; Cervantes Decl. ¶ 7; Cotton Decl. ¶ 11; Baker Decl. ¶ 7; Degroot Decl. ¶ 31.)

149. Hawkinson alleges that APNP Trzebiatowski mistreated him and blocked his care. Utter saw no evidence that APNP Trzebiatowski did anything of the

sort, and there was not a reason to investigate APNP Trzebiatowski. (Utter Decl. ¶¶ 120, 121.)

150. Utter reviewed the HSR responses by Nurses Henning, Kilmer, Cotton, Baker, Bost, and Soquet/Yonash in this declaration. Utter believes those responses were appropriate based on the Hawkinson's established plan of care related to his chronic pain. (Utter Decl. ¶ 123.)

Dated: June 3, 2025

Respectfully submitted,

JOSHUA L. KAUL
Attorney General of Wisconsin

*s/ Pauline Toulouse*
PAULINE TOULOUSE
Assistant Attorney General
State Bar #1087799

BRANDON T. FLUGAUR
Assistant Attorney General
State Bar #1074305

Attorneys for State Defendants
Baker, Bost, Cotton, DeGroot, Henning, Kilmer, Stevens, Soquet Yonash, and Utter

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 264-9451 (Toulouse)
(608) 266-1780 (Flugaur)
(608) 294-2907 (Fax)
toulousep@doj.state.wi.us
flugaurbt@doj.state.wi.us