UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DAVID R. HAWKINSON,

                    Plaintiff,

         v.                                        Case No. 23-cv-634-pp

VIRGINIA TRZEBIATOWSKI, *et al.*,

                    Defendants.

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 73), DENYING DEFENDANT TRZEBIATOWSKI'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 93), GRANTING IN PART AND DENYING IN PART STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 109), DENYING PLAINTIFF'S MOTION TO COMPEL OR FOR INJUNCTION (DKT. NO. 141) AND DENYING AS MOOT PLAINTIFF'S MOTION FOR EXTENSION OF TIME (DKT. NO. 146)**

         Plaintiff David R. Hawkinson, who is incarcerated at Oshkosh Correctional Institution and is representing himself, filed a complaint alleging that the defendants violated his constitutional rights; he later amended that complaint. The court screened the amended complaint and allowed the plaintiff to proceed on Eighth Amendment medical care claims based on allegations that defendants Virginia Trzebiatowski and Hannah Utter denied and/or delayed providing the plaintiff treatment for his back and neck conditions; that defendants Derek Henning, Rachel Cotton, Steven Bost, Jennifer Kilmer, Ellyn Baker and Larissa Soquet Yonash (n/k/a Cervantes) knew about the plaintiff's painful condition but did not provide him medical care; and that defendant Alan DeGroot knew about the plaintiff's condition but did not help him. Dkt. No. 19 at 16; see also Dkt. No. 20 (Amended Complaint). The court subsequently granted the plaintiff's motion for leave to file a supplemental

1

complaint and to proceed on Eighth Amendment medical care claims against defendant Christopher Stevens based on allegations that Stevens knew about the plaintiff's ongoing, painful medical conditions and had the ability to help him but did not do so. Dkt. No. 32 at 10; see also Dkt. No. 25 (Supplemental Complaint).[1] This order addresses the plaintiff's motion for summary judgment, dkt. no. 73, defendant Trzebiatowski's motion for summary judgment, dkt. no. 93, and the State defendants' (Utter, Henning, Cotton, Bost, Kilmer, Baker, Yonash, DeGroot and Stevens) motion for summary judgment, dkt. no. 109. It also addresses the plaintiff's motions to compel or for preliminary injunction, dkt. no. 141, and his motion for extension of time, dkt. no. 146.

## I.    Facts[2]

### A.    Parties

The plaintiff was incarcerated at Green Bay Correctional Institution during the events described in the amended complaint. Dkt. No. 96 at ¶4. Defendant Trzebiatowski, an advanced practice nurse provider (APNP), is one of several medical providers who evaluated or provided care for the plaintiff at times relevant to the complaint allegations. Id. at ¶¶5-7. Institutions regularly work with outside providers to provide care to incarcerated individuals. Id. at ¶12. Only an advanced care provider, such as Trzebiatowski, may make a referral to an outside provider. Id. at ¶13. Trzebiatowski had no role in scheduling off-site appointments with outside providers. Id. at ¶16.

---

[1] The operative complaint consists of the amended complaint (Dkt. No. 20) and the supplemental complaint (Dkt. No. 25).

[2] The court includes only material, properly supported facts in this section. See Fed. R. Civ. P. 56(c).

2

The State defendants had the following roles during the events described in the amended complaint: defendant Utter was Green Bay's Health Services Unit (HSU) manager from March 2020 to December 2022; defendants Henning, Cotton, Bost, Kilmer, Baker and Yonash (n/k/a Cervantes) are or were nurse clinicians at Green Bay; defendant Degroot is an institution complaint examiner at Green Bay; and defendant Stevens has been the warden at Green Bay since April 23, 2023. Dkt. No. 111 at ¶¶1-9.

The HSU manager provides the overall administrative support and direction of the HSU. Dkt. No. 111 at ¶12. At times, the HSU manager may meet with an incarcerated individual to discuss his plan of care or may assist nursing staff in staff shortages, but the HSU manager generally does not evaluate, diagnose, determine a course of treatment for, or prescribe medications for patients. Id. at ¶13. The HSU manager defers to the decisions of advanced care providers (ACPs) regarding a patient's care, and at all times relevant to the amended complaint, Utter deferred to the ACPs to determine an appropriate plan of care for the plaintiff. Id. ACPs—such as physicians and advanced practice nurse prescribers—are responsible for final treatment decisions and care plans. Id. at ¶14. They also are responsible for writing prescriptions, making offsite referrals and approving treatment recommendations of offsite providers. Id. The HSU manager supervises the nursing staff in the HSU, including licensed practical nurses, registered nurses and the Medical Program Assistant Associates (MPAA). Id. at ¶15.

As nurse clinicians, Kilmer, Bost, Henning, Yonash, Cotton and Baker's responsibilities included providing skilled nursing care to patients. Dkt. No. 111 at ¶16. This included providing patient assessment and treatment,

3

assisting the physician in providing medical services, managing medications, providing emergency care and maintaining medical records. Id.

B.      Plaintiff's Medical Care

On August 2, 2021, the plaintiff was seen at BayCare Clinic Pain & Rehab for neck and right arm pain. Dkt. No. 111 at ¶39. The plaintiff's treatment history included a cervical epidural steroid injection on June 11, 2021, for which he reported he experienced eighty percent improvement. Id. He reported completing other treatments—heat, ice, bedrest, physical therapy, chiropractic care, exercise and traction. Id. The provider diagnosed the plaintiff with cervical stenosis and right upper extremity radiculitis. Id. The provider recommended that the plaintiff repeat the cervical epidural steroid injection. Id.

On August 12, 2021, Trzebiatowski placed an order for an appointment to be scheduled with Prevea Pain Services for a repeat cervical epidural steroid injection. Dkt. No. 111 at ¶40. On August 31, 2021, Nurse Cotton asked MPAA Mapes about the status of the plaintiff's pain service appointment. Id. at ¶41. Mapes reported that she was waiting for the on-site provider to get back to her regarding where to send the plaintiff. Id. On September 27 and 28, 2021, Mapes informed Trzebiatowski that the HSU was in the process of transitioning pain service appointments from Aurora to Prevea. Id. at ¶43. Mapes asked if the plaintiff could be sent to Prevea. Id. Trzebiatowski responded that Prevea would be fine and changed the referral. Id.

On October 15, 2021, Trzebiatowski saw the plaintiff for complaints of worsening palpitations and swelling of his left leg.[3] Dkt. No. 96 at ¶21. The

---

[3] Trzebiatowski saw the plaintiff for in-person visits a total of four times from October 15, 2021 until November 2, 2022. Dkt. No. 96 at ¶20. In December 2021, Trzebiatowski travelled to Florida for an extended four-month stay. Id. at

plaintiff asked to discuss his neck pain but per standard practice, Trzebiatowski would address only his complaints of palpitations and leg swelling at this visit. Id. at ¶22.

On October 21, 2021, a physical therapist evaluated the plaintiff for his neck and back pain. Dkt. No. 111 at ¶45. He received physical therapy on November 15, 2021. Id.

On November 11, 2021, the plaintiff submitted a health service request (HSR) asking why he had not received an injection in his neck. Dkt. No. 111 at ¶46. Nurse Bost informed him that pain management was coming back on-site so appointments were getting caught up. Id. The next day, Dr. Rojas placed an order for duloxetine 20 mg., which was good until September 5, 2022. Id. at ¶47. According to the plaintiff, duloxetine was prescribed for depression, and it reduced pain for about three months. Dkt. No. 132 at ¶47. Also on November 12, 2021, Mapes placed a note in the plaintiff's chart stating that after she faxed the pain services order to Prevea, she received a phone call from a nurse stating that their off-site provider does not perform the cervical epidural steroid injection ordered for the plaintiff. Dkt. No. 111 at ¶48.

On December 8, 2021, the plaintiff submitted an HSR asking why he had not received the injection in his spine for his pain. Dkt. No. 111 at ¶49. Bost informed him that he had an appointment scheduled in two weeks. Id.

Two weeks later, on December 21, 2021, the plaintiff had a cervical injection offsite at Aurora. Dkt. No. 111 at ¶50. The defendants state that at the end of this visit, no specific follow-up was ordered. Id. Contrary to the

_____

¶26. Dkt. No. 96 at ¶26. She did not work at Green Bay during that time, and she returned in April 2022. Id.

defendants' assertion, the discharge papers from Aurora say that the plaintiff is to "[f]ollow up in clinic in 3-4 weeks." Dkt. No. 112-1 at 166.

Two days after the plaintiff's cervical injection, Nurse Henning saw him for complaints of neck spasms and a "snap" in his back the day prior. Dkt. No. 111 at ¶53. Henning noted that the plaintiff had an epidural steroid injection on December 21, and that the spasms were below the injection site. Id. The plaintiff reported that his neck felt better since the injection, his right thumb no longer was tingling, his left thumb was tingling and he had back pain below the injection site. Id. Henning explained that there can be pain/discomfort for up to one week following an injection. Id. Henning directed the plaintiff to continue using Tylenol and naproxen, do only soft stretches and use positions of comfort. Id.

On January 19, 2022, the plaintiff submitted an HSR stating, "I need help with my back. I am doing all the treatments I am able. Whatever is wrong needs to be treated as a whole. The pain is causing psychological problems. Why can't I get treatment?" Dkt. No. 111 at ¶54. Henning informed the plaintiff that he had an appointment with his ACP on January 24, 2022. Id.

On January 24, 2022, APNP Wachholz (not a defendant) saw the plaintiff for several issues. Dkt. No. 111 at ¶55. The plaintiff reported improvement in neck pain following a cervical injection, though the pain was persistent to a lesser degree. Id. The plaintiff focused on his thoracic pain. Id. Wachholz ordered a follow-up in six months for cervical pain. Id. For the pain in the plaintiff's thoracic region, Wachholz ordered a focused ACP visit for February 17, 2022. Dkt. No. 112-1 at 45. (It appears that this ACP visit did not happen.)

On February 2, 2022, the plaintiff submitted an HSR stating, "I need help with my back. The T2-T3 area is killing me. The treatments for my neck

6

are not working on the thoracic pain. HELP!" Dkt. No. 111 at ¶56. Bost informed him that he had a pending appointment with his provider for his back pain. Id. Bost is not responsible for scheduling those appointments; the MPAA is. Id. at ¶58.

On March 17, 2022, the plaintiff submitted an HSR stating, "When am I due for another shot in my neck? The pain is creeping back, 5+ all the time with periods of 10. (short periods) so far." Dkt. No. 111 at ¶59. The next day, Nurse Kilmer informed the plaintiff that there was no order for a neck injection at that time. Id. According to the defendants, Kilmer appropriately answered the plaintiff's question because the offsite clinic did not recommend a follow-up appointment. Id. at ¶61. But as stated above, the offsite clinic *did* recommend a follow-up appointment. The defendants state that Kilmer also added the plaintiff's neck pain concerns to an already existing appointment with Henning scheduled for March 24, 2022, so that the plaintiff's pain concerns could be further assessed. Id. at ¶60. The record does not state that Henning discussed the plaintiff's neck pain at the March 24, 2022 appointment.

On May 13, 2022, Trzebiatowski saw the plaintiff for care focused on his blood pressure, Vitamin D level and testosterone therapy. Dkt. No. 96 at ¶27. Trzebiatowski informed the plaintiff that she would discuss his request to change to his testosterone dosing schedule with Dr. LaVoie and would look into his request for an ongoing prescription for Vitamin D. Id. at ¶29.

On June 2, 2022, the plaintiff submitted an HSR stating, "Why did you change my Naproxen prescription? This was for the pain in my arm shoulder and neck all of which will never heal, but it is getting worse. Please Refer to MRI of cervical spine." Dkt. No. 111 at ¶63. Henning informed him that the medication was changed due to new DOC pharmacy standards. Id.

7

On July 18, 2022, the plaintiff submitted an HSR stating, "I need another shot in my neck nothing is helping again." Dkt. No. 111 at ¶64. Henning informed him that he had an ACP referral in place pending scheduling and to let HSU know if he needed a nursing sick call. Id. The ACP referral order Henning referenced was the six-month follow-up appointment entered on January 24, 2022 by Wachholz for the plaintiff's neck pain. Id. at ¶65. This appointment was "due" July 24, 2022, but did not occur until October 5, 2022. Id.

On August 5, 2022, the plaintiff submitted an HSR stating, "I Do Not need a sick call, you already have MRI showing I have a condition that will never heal and will need constant treatment. If it is $7.50 you need, take it and send me for the epidural in my cervical spine." Dkt. No. 111 at ¶66. Although this HSR is dated August 5, 2022, Cotton received it on September 6, 2022, and on that date, Cotton informed the plaintiff that the provider had ordered a referral to Pain Services. Id.

On August 25, 2022, Nurse Hartjes (not a defendant) messaged Trzebiatowski that the plaintiff had asked about a cervical injection which he had not had in a few months and that she could not see anything on the schedule or waiting to be scheduled. Dkt. No. 111 at ¶67. The next day, Trzebiatowski asked Hartjes to inform the plaintiff that the last follow-up pain service visit from December 2021 did not advise that a follow-up visit was recommended. Id. Trzebiatowski entered the order for the plaintiff to be put on the waiting list to transition to Prevea pain services. Dkt. No. 111 at ¶67. On August 26, 2022, the plaintiff received a letter stating, "HSU spoke with your ACP and according to records from 12/22 [sic] the last pain note noted that a need for follow up was not advised. The ACP is willing to put in an order in to

8

be placed on the wait list to transition to Prevea Pain Service. If you have any further questions let HSU know. Health Services Unit Staff." Id. at ¶68. As pointed out by the plaintiff, contrary to Trzebiatowski's statement to Hartjes and contrary to the letter the plaintiff received from the HSU, the off-site provider from the December 2021 visit *did* recommend a follow-up visit. Dkt. No. 132 at ¶68.

On September 1, 2022, Dr. Rojas placed an order for duloxetine for the plaintiff, which was good until August 16, 2023. Dkt. No. 111 at ¶69. The medical record shows that this was from a psychiatric appointment. Dkt. No. 132 at ¶69.

On October 5, 2022, Trzebiatowski saw the plaintiff for complaints of hemorrhoids, follow-up on Obstructive Sleep Apnea treated with CPAP, headaches and sciatica. Dkt. No. 96 at ¶31. The plaintiff reported right groin pain and sciatica, although he stated his neck was the more bothersome concern. Id. at ¶32. Trzebiatowski noted that the plaintiff previously had an epidural steroid injection and requested another. Id. at ¶33. Trzebiatowski made a referral to Prevea Health for those concerns. Id. at ¶34.

On October 14, 2022, the plaintiff saw the on-site pain services APNP for cervical pain. Dkt. No. 111 at ¶73. The APNP recommended a repeat cervical injection. Id. About two weeks later, Prevea faxed Kilmer a recommendation for a referral to Bellin for the procedure. Dkt. No. 111 at ¶75.

On November 2, 2022, Trzebiatowski saw the plaintiff for an in-person visit to evaluate near syncopal episodes and his concerns for low blood sugar when he worked in the mornings. Dkt. No. 96 at ¶39.

Two days later, the plaintiff submitted two HSRs asking why he had not received his epidural for pain. Dkt. No. 111 at ¶76. Kilmer informed him that

9

an injection was ordered and pending scheduling. Id. On November 20, 2022, the plaintiff submitted an HSR stating "I would like my TENS unit back, I feel like I am dying." Id. at ¶77. Nurse Baker responded, "Tens unit ordered [sic] expired forward to special needs." Id. On December 7, 2022, the plaintiff submitted an HSR stating, "I feel that HSU is intentionally delaying my epidural and this is causing me agonizing pain on a daily basis. This is causing depression and other mental problems. Why have I not received my epidural[?]" Id. at ¶78. Henning informed him there was a referral in place and it was pending scheduling. Id. Henning also stated that the plaintiff had an appointment scheduled to see his ACP on December 22. Id. (It appears that this appointment did not happen.)

On December 21, 2022, the plaintiff directed an Information Request to Utter stating,

> I am having a problem with my neck and back. It is causing me agonizing pain. As of the 22nd of December it will be one year since my last epidural. A shot I am supposed to get every three months. Every time I write HSU it is always the same answer, you have an appointment coming up. In the meantime, it is getting worse. I have had to go on antidepressants because of the pain. Some days it is so bad all I do is go to the bathroom and eat. Please tell me what is going on, and why it is taking so long?

Dkt. No. 111 at ¶79. Utter did not see or respond to this request. Id. Henning responded by letting the plaintiff know that as of December 5, 2022, Utter was no longer the HSU manager. Id. Henning also responded that HSU was at the mercy of outside provider schedules, which had switched to Prevea Pain Services. Id.

On December 25, 2022, the plaintiff submitted an HSR stating that he wanted to go back on seizure medication and that he was having seizures more frequently because of the increased stress. Dkt. No. 111 at ¶80. Nurses Yonash

and Baker responded that he could discuss with his provider restarting his medication. Id. They also said that he had an appointment scheduled on January 26 with his ACP and that his next psychiatric appointment was in four to six weeks. Id. (It appears that the plaintiff did not have a January 26, 2023 appointment with his ACP.)

On December 27, 2022, Bellin Hospital pain services responded to Mapes regarding her request for a cervical injection, stating that they needed a diagnosis code and to verify whether the plaintiff had ever done physical therapy for his neck pain. Dkt. No. 111 at ¶81.

On January 28, 2023, the plaintiff submitted an HSR stating, "When I Lay Down there is pain between my shoulder blades around T2-T3, T3-T4. My hands hurt. My right arm hurts. Right now it hurts to write this." Dkt. No. 111 at ¶84. Baker informed the plaintiff that he had a provider appointment on February 10 and asked if he needed to be seen sooner. Id.

On February 10, 2023, Dr. Daughtry saw the plaintiff for cervical pain, low back pain and low testosterone. Id. at ¶85. Daughtry noted that the plaintiff had a history of cervical radiculopathy with numbness in both hands at night; his neck pain is "pretty severe"; he works doing sewing at BCI; he takes naproxen and Tylenol; he has an order to get a cervical injection with Dr. Yeatman; he is on duloxetine which helps some; he had a neck injection in December 2021 at Baycare; he was supposed to get an injection at Bellin Hospital but they were asking for more physical therapy of the neck first; he had several other neck injections in the past; and he also had upper back pain. Id. Daughtry placed an order for celecoxib until January 20, 2024, and ordered an x-ray of the thoracic spine due to the plaintiff's upper back pain. Id.

On February 16, 2023, the Hospital Sisters Health System advised that the plaintiff needed an updated cervical MRI before he could have an epidural steroid injection. Dkt. No. 111 at ¶¶86-87. Prevea providers work out of the Hospital Sisters Health System. Id. at ¶90.

On February 24, 2023, the plaintiff had an x-ray of his thoracic (upper) back. Dkt. No. 111 at ¶91. On March 7, 2023, a letter was sent to the plaintiff stating, "Your x-ray of the lumbar spine showed some narrowing of the discs between the vertebrae. It was otherwise normal." Id.

On March 8, 2023, the plaintiff submitted an HSR stating, "I still have extreme pain in both arms, hands, and neck. I have not received my injection for pain. What is going on?" Dkt. No. 111 at ¶92. Henning informed him that he was scheduled for a cervical MRI that month before his epidural steroid injection. Id. On March 12, 2023, the plaintiff submitted an HSR stating, "Pain, Bad, HELP!" Id. at ¶93. Baker responded, asking that he specify what he needed to be seen for, explaining that specifics help to schedule him appropriately. Id. That same day, the plaintiff submitted another HSR stating that his hands were not working appropriately, and that his right arm was swelled up. Id. Baker responded that he was scheduled to be seen in the HSU. Id.

On March 28, 2023, the plaintiff had a cervical MRI at Hospital Sisters Health System. Dkt. No. 111 at ¶94. On April 21, 2023, the plaintiff saw Daughtry for a follow-up of his testosterone, cervical radiculopathy and seizure disorder. Id. at ¶95. For his cervical pain, Daughtry noted that there was a cervical injection pending. Id. For medication, the plaintiff would resume Celebrex after the injection. Id. Daughtry ordered acetaminophen 500 mg., with a follow-up in three months. Id.

On April 26, 2023, the plaintiff was transported to St. Vincent Hospital where he received a cervical injection for his cervical pain. Dkt. No. 111 at ¶96.

Four days later, the plaintiff submitted an HSR requesting an explanation of his MRI. Dkt. No. 111 at ¶98. He also stated that the epidural steroid injection "worked pretty good on my neck," and asked if there was a diagnosis of his neck. Id. Henning advised him to discuss his concerns and questions with his provider at his next scheduled appointment. Id.

On May 6, 2023, Nurse McNeel (not a defendant) saw the plaintiff after receiving a call from security that he was asking for a walker due to complaints of back pain. Dkt. No. 111 at ¶99. The plaintiff stated that he was reaching for a paper and felt something pull in his back. Id. He reported having an MRI of his back in 2019 or 2020 and that he has a herniated disc sciatica. Id. He stated that this had happened before and that he just needed a walker to help him get to and from the bathroom, and that he wanted to go back to work on Monday. Id. McNeel provided him with a walker to use over the weekend. Id.

On May 8, 2023, McNeel saw the plaintiff as a follow-up to the need for the walker. Dkt. No. 111 at ¶101. The plaintiff stated that he no longer needed the walker and wanted to return to work. Id. He asked about when he would see the provider for his low back pain, and she explained that the referral/order to see the provider had been entered but not yet scheduled. Id.

On May 17, 2023, Daughtry saw the plaintiff for complaints of low and upper back pain. Dkt. No. 111 at ¶101. The plaintiff reported that Celebrex was helping temporarily, and he had lidocaine cream. Id. He said his neck pain had improved with a recent epidural injection. Id. For his upper back pain, Daughtry ordered methocarbamol 750 mg., two times daily for three weeks for muscle spasms. Id.

On June 21, 2023, the plaintiff submitted an HSR asking if there was a physical therapy order. Dkt. No. 111 at ¶103. Henning informed him that there was a physical therapy order. Id.

On August 11, 2023, the plaintiff was transported to pain services for a follow-up for his neck pain and complaints of low back pain. Dkt. No. 111 at ¶104. An APNP recommended (1) a cervical epidural steroid injection, (2) an increase of the duloxetine to 60 mg, (3) a lumber spine MRI and (4) a TENS unit for the low back pain. Id.

For the plaintiff's low back/lumbar pain, he was seen on August 17, 2021, October 21, 2021, January 24, 2022 and February 10, 2023. Dkt. No. 111 at ¶105. He also had a lumber spine x-ray on February 24, 2023, and he received physical therapy on October 21, 2021 and on November 15, 2021. Id. He also received a TENS unit to assist with sciatica pain that was in effect from November 1, 2021 through April 30, 2022, and from August 11, 2023 through August 10, 2024. Id. He was to perform home exercises. Id.

C.    Plaintiff's Inmate Complaints

As an institution complaint examiner (ICE), defendant DeGroot investigates complaints filed by incarcerated individuals using the Inmate Complaint Review System (ICRS). Dkt. No. 111 at ¶110. After investigating a complaint, DeGroot issues a recommendation to the reviewing authority (RA), who then decides the complaint. Id. at ¶111. The RA is not required to follow Degroot's recommendation. Id. at ¶113. DeGroot's investigation includes his communication with relevant staff such as the subject-matter experts, their responses and his review of relevant records. Id. For complaints regarding medical care, the subject-matter experts include the assistant health services

14

manager (AHSM) and the HSU manager. Id. at ¶117. On occasion, Degroot also may consult a registered nurse. Id.

DeGroot recommended a dismissal of the plaintiff's complaints GBCI-2021-15929 and 2023-257 because his investigation revealed that the plaintiff's concerns were being properly addressed. Dkt. No. 111 at ¶119. DeGroot did not recommend a dismissal of GBCI-2023-9773. Id. at ¶120. Another ICE, Z. Paul, recommended a dismissal of that complaint. Id.

If an incarcerated individual complains that a specific treatment is not being offered, DeGroot defers to the judgment of the AHSM or HSU manager. Dkt. No. 111 at ¶120. What type of specific care or treatment must be offered is a matter of professional medical judgment, and DeGroot is not a health care professional. Id. If an individual complains about treatment delay, DeGroot discusses his treatment history with the AHSM. Id. at ¶121. The AHSM can review the incarcerated individual's medical file to assist in his investigation. Id. An incarcerated person who is dissatisfied with an RA's decision can appeal that decision to the corrections complaint examiner (CCE). Id. at ¶125. The Office of the Secretary then issues a final decision. Id.

On February 2, 2023, Utter acted as the RA on GBCI-2023-257, a complaint the plaintiff filed alleging delayed medical care for his neck and back. Dkt. No. 111 at ¶126. Utter dismissed this complaint stating:

> Plaintiff completed injections at Aurora in 12/2021, in which they recommended follow up with his DOC provider. The patient was then seen 5/2022 for unrelated issues and 10/2022 for a follow up on the neck pain. Patient was referred to Prevea Pain Services who [Green Bay] has a contract with. They then referred him in 10/22 to Bellin for an injection; but Bellin will not see him unless he completes Physical Therapy for his neck first. The patient has seen his new DOC provider Dr. Daughtry on 2/10/23 and has a pending appointment with Interventional Radiology for an injection. Although the patient states [Green Bay] failed to schedule for his

15

injection, it is clear in the medical record that they have been seeing the patient and referring the patient out as indicated.

Id.; Dkt. No. 61-3 at 3. The plaintiff appealed Utter's decision, and the CCE also recommended that the complaint be dismissed. Dkt. No. 61-3 at 5. But the Office of the Secretary did not follow that recommendation; instead, it affirmed the appeal, commenting:

> Though the complainant was seen by a provider in May 2022, he was not seen for the issue he was referred back to the provider for in December 2021. For that referral, he was not seen until October 2022. The BHS Director has reviewed and confirmed that waiting 10 months to see a provider for follow-up is not reasonable.

Dkt. No. 61-3 at 6.

### D.    Correspondence to Warden Stevens

On July 10, 2023, Warden Stevens received a communication from the plaintiff stating that the plaintiff had severe back and neck pain, and that he had not been receiving proper medical care. Dkt. No. 111 at ¶130. Three days later, Stevens responded to the plaintiff's correspondence, informing him that the issues the plaintiff had raised in his letter already had been raised through the grievance system. Id. at ¶131. Stevens encouraged the plaintiff to allow the ICE office to complete the process. Id.

On August 14, 2023, Stevens's office received an information request from the plaintiff stating that Stevens and his staff were conspiring to violate the plaintiff's constitutional rights by making it look like he had an appointment. Dkt. No. 111 at ¶132. Ten days later, Stevens responded to the plaintiff's request, stating that his appeal of the dismissal of his administrative grievance was pending and that the warden's office would not be addressing issue again because his administrative remedies were exhausted.  Id. at ¶133.

16

## II. Analysis

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be, or is, genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

### B. Discussion

In his motion for summary judgment, the plaintiff contends that the defendants violated his constitutional rights for medical care issues related to his claims in this case (not treating his neck and back pain) and for medical

care issues unrelated to his claims in this case (heart attack, testosterone issues, seizures). Dkt. No. 73. The plaintiff's summary judgment brief is rambling and hard to follow. He did not file a statement of proposed material facts in support of his motion, as required by this court's Local Rules. See Civil Local Rule 56(b)(1)(C) (E.D. Wis.). Based on the above-described deficiencies, the plaintiff has not established that he is entitled to summary judgment, and the court will deny his summary judgment motion. See Modrowski v. Pitgatto, 712 F.3d 1166, 1169 (7th Cir. 2013) (court has "discretion to require strict compliance with its local rules governing summary judgment[]"); see also Civil L.R. 56(b)(9).

Trzebiatowski contends that the plaintiff's deliberate indifference claim fails as a matter of law because she did not disregard a significant medical need of the plaintiff. Dkt. No. 97 at 9. According to Trzebiatowski, the plaintiff cannot prove that he had a serious medical condition, and there is no evidence that she acted with deliberate indifference. Id. at 11-14. Similarly, the State defendants contend that the court must dismiss the plaintiff's Eighth Amendment claim because he did not have an objectively serious medical condition. Dkt. No. 110 at 7-9. The State defendants also contend that the court must dismiss the plaintiff's claims because the State defendants were not aware of, nor did they disregard, a serious medical need. Id. at 9-27. Finally, the State defendants contend that they are entitled to qualified immunity. Id. at 27-29.

The court analyzes a plaintiff's claim that the defendants were deliberately indifferent to his serious medical needs under the Eighth Amendment's cruel and unusual punishments clause. Estelle v. Gamble, 429 U.S. 97, 104 (1976). An Eighth Amendment claim consists of both objective

and subjective components. Farmer v. Brennan, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must show that he "is incarcerated under conditions posing a substantial risk of serious harm." Id. In the context of a claim that prison staff were deliberately indifferent to a plaintiff's serious medical need, the objective component requires the plaintiff to show that his medical need constituted a risk of an objectively serious harm. Stewart v. Wexford Health Sources, Inc., 14 F.4th 757, 763 (7th Cir. 2021) (citing Balsewicz v. Pawlyk, 963 F.3d 650, 654 (7th Cir. 2020)).

The defendants' contention that the plaintiff did not have a serious medical need lacks merit. The plaintiff had a diagnosis of cervical stenosis and right upper extremity radiculitis; he received cervical steroid injections, medication and other treatment for his neck pain; and he complained repeatedly of severe, debilitating pain. For summary judgment purposes, the plaintiff had a serious medical need under the Eighth Amendment. See Gutierrez v. Peters, 111 F.3d 1364, 1373 (7th Cir. 1997) (serious medical need "is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention[]") (quotation omitted)); Gayton v. McCoy, 593 F.3d 610, 620 (7th Cir. 2010) (A medical condition does not need to "be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated.").

To satisfy the subjective component of the deliberate indifference standard, the plaintiff must demonstrate that the defendant had a "sufficiently culpable state of mind." Farmer, 511 U.S. at 834. A prison official shows deliberate indifference when he "realizes that a substantial risk of serious harm to a prisoner exists, but then disregards that risk." Perez v. Fenoglio, 792 F.3d

768, 776 (7th Cir. 2015) (citing Farmer, 511 U.S. at 837). "The standard of deliberate indifference 'requires more than negligence or even gross negligence; a plaintiff must show that the defendant was essentially criminally reckless, that is, ignored a known risk.'" Stewart, 14 F.4th at 763 (quoting Huber v. Anderson, 909 F.3d 201, 208 (7th Cir. 2018)). The evidence must show the defendant's "actual, personal knowledge of a serious risk, coupled with the lack of any reasonable response to it." Ayoubi v. Dart, 724 F. App'x 470, 474 (7th Cir. 2018) (citing Farmer, 511 U.S. at 837, 844–45).

In the context a claim of deliberate indifference against a medical provider, the subjective component requires the plaintiff to show that the medical professional's treatment decision was "so inadequate that it demonstrated an absence of professional judgment." Stewart, 14 F.4th at 763 (quoting Johnson v. Dominguez, 5 F.4th 818, 826 (7th Cir. 2021)). Put another way,

> "A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'" [*Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)] (quoting *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008)). "To infer deliberate indifference on the basis of a [medical professional's] treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006).

Id.

The plaintiff's claims are based on Trzebiatowski's and Utter's alleged denial and delay of treatment for his neck and back pain. The plaintiff also claims that the nurse defendants—Henning, Cotton, Bost, Kilmer, Baker and Yonash—acted with deliberate indifference because they knew about his extreme pain but did not provide him with medical care. The plaintiff claims that DeGroot is liable because he knew about the plaintiff's condition from the

plaintiff's inmate complaints, but did not help the plaintiff. Finally, the plaintiff claims that Stevens acted with deliberate indifference because the plaintiff sent him letters about the pattern of delay and denial of medical care, but Stevens did not address the situation.

The plaintiff received a cervical epidural injection for his neck pain on August 2, 2021, and the provider recommended repeat injections for his condition. Trzebiatowski referred the plaintiff to Aurora for his next epidural injection for neck pain, which the plaintiff received on December 21, 2021. Dkt. No. 112-1 at 160. Contrary to the defendants' assertion that the provider did not recommend any follow-up care or appointments, the provider instructed at discharge that the plaintiff should follow up in the clinic in three to four weeks. Id. at 166. The plaintiff did not receive a follow-up appointment for almost ten months, until October 14, 2022, at which time Prevea Pain Services recommended a repeat cervical injection. The plaintiff waited another six months for the injection, which he received on April 26, 2023.

Although Trzebiatowski contends that she appropriately treated the plaintiff during the four in-person appointments the plaintiff had with her, questions remain as to why the plaintiff did not return to the clinic for a follow-up appointment three to four weeks after his December 21, 2021 cervical injection. Because Trzebiatowski was the provider who referred the plaintiff to the clinic for the appointment, it appears that she would be responsible for ensuring that he return for his follow-up appointment. Instead, the plaintiff inexplicably was told that no further treatment was needed because the off-site provider did not order any follow-up care. The plaintiff had an appointment with Trzebiatowski in May 2022, during which his neck pain was not addressed. In addition, in August 2022, Trzebiatowski incorrectly told Hartjes

21

that the provider had not recommended a follow-up appointment after the plaintiff's December 2021 cervical injection.

The plaintiff repeatedly complained of being in severe pain and he kept being told that appointments were pending or would be scheduled. When the plaintiff had an appointment with Wachholz on January 24, 2022 for neck pain and back pain, Wachholz ordered a follow-up appointment for neck pain for six months. The HSRs the plaintiff submitted over the next several months regarding his pain were responded to primarily by referencing his upcoming appointment with an APNP for six months from January 2022, which would have been in July 2022. That appointment didn't happen until October 5, 2022, which was the plaintiff's second appointment with Trzebiatowski. At that appointment, which was about ten months after the plaintiff's epidural injection for his neck, Trzebiatowski referred him for an appointment with Prevea. That appointment took place on October 14, 2022, and it took another six months for the plaintiff to have his next cervical injection because the clinic needed an updated MRI and required him to do physical therapy. While prison staff cannot control the requirements of outside medical providers, these delays probably would have been avoided if the plaintiff had simply had his follow-up appointment in the clinic three to four weeks after his December 2021 epidural injection.

Trzebiatowski incorrectly told at least one nurse that the December 21, 2021 provider did not order a follow-up appointment. The plaintiff repeatedly complained of being in severe pain and requested another cervical injection for his neck pain. His medical appointments either did not address his neck pain or they did not happen. "An inmate may establish deliberate indifference by demonstrating that prison officials ignored a specialist's instructions." Riley v.

Waterman, 126 F.4th 1287, 1295-96 (7th Cir. 2025) (citing Zaya v. Sood, 836 F.3d 800, 805-06 (7th Cir. 2016)). A reasonable factfinder could conclude that Trzebiatowski ignored the provider's instruction that the plaintiff should return to the clinic three to four weeks after his December 2021 epidural injection resulting in months of unnecessary and severe pain for the plaintiff. The court will deny Trzebiatowski's motion for summary judgment.

The nursing defendants did not have the authority to refer the plaintiff offsite, nor did they schedule appointments. But they did have the ability to consult the plaintiff's medical records, which said that the plaintiff should have a follow-up appointment in the clinic three to four weeks after his December 2021 cervical injection. After the injection appointment, the plaintiff first complained of severe neck pain in February 2022. On March 17, 2022, Kilmer said that the plaintiff did not have an order for another epidural injection, but that his neck pain issue would be added to his March 24, 2022 appointment with Henning. Kilmer may have checked the plaintiff's medical records to provide that information to the plaintiff, and those records said that he should have a follow-up appointment with the provider who performed his cervical epidural injection. At the March 24, 2022 appointment, Henning did not address the plaintiff's neck pain. A few months later, Henning told the plaintiff that his Naproxen pain medication would be changed due to new DOC pharmacy standards. In July 2022, the plaintiff again asked about his epidural injection and Henning said he could discuss it at his upcoming ACP appointment, which was to take place later that month but which didn't happen until October 5, 2022. On August 5, 2022, Cotton responded to an HSR from the plaintiff in which the plaintiff requested an epidural for his cervical spine by saying that his provider had ordered referral, but the

23

appointment was not yet scheduled. On August 25, 2022, Hartjes messaged Trzebiatowski about the plaintiff's next epidural injection. The next day, the plaintiff received a letter from "HSU Staff" incorrectly stating that no follow-up appointment had been ordered after his December 2021 epidural injection.

A delay in treatment causes a cognizable injury where it either exacerbates an incarcerated individual's injury or unnecessarily prolongs his pain. Thomas v. Martija, 991 F.3d 763, 771 (7th Cir. 2021). Regarding chronic pain conditions, "the Eighth Amendment does not entitle incarcerated patients to their preferred pain medication, nor does it impose the unrealistic requirement that doctors keep patients completely pain free. Arce v. Wexford Health Sources, Inc., 75 F.4th 673, 681 (7th Cir. 2023) (citing Arnett v. Webster, 658 F.3d 742, 753-54 (7th Cir. 2011) and Snipes v. DeTella, 95 F.3d 586, 592 (7th Cir. 1996)). Based on the plaintiff's complaints of severe pain and interactions with Kilmer, Henning and Cotton, a reasonable factfinder could conclude that these defendants disregarded the plaintiff's ongoing, severe pain.

The record does not establish that the other nurse defendants—Bost, Baker and Yonash—disregarded the plaintiff's complaints of neck pain. Bost responded to an HSR the plaintiff submitted regarding his back pain, not his neck pain, by saying that he had an appointment pending. Yonash responded only to the plaintiff's HSR about seizure medication. Baker appropriately responded to the plaintiff's request for a TENS unit, about back pain, about general pain and about seizure medication. Bost, Baker and Yonash lack direct involvement in the delay the plaintiff experienced in receiving relief for his neck pain. See Rasho v. Elyea, 856 F.3d 469, 478 (7th Cir. 2017) (to hold individual liable under §1983 for a violation of an incarcerated individual's constitutional rights, the individual must show that the defendant was personally responsible

for that violation). A reasonable factfinder could not conclude that Bost, Baker or Yonash violated the plaintiff's constitutional rights.

Utter was the HSU manager until December 5, 2023, and she supervised the nurse defendants. Section 1983 limits liability to public employees who are personally responsible for a constitutional violation. Burks v. Raemisch, 555 F.3d 592, 595-96 (7th Cir. 2009). For liability to attach, the individual defendant must have caused or participated in a constitutional violation. Hildebrandt v. Ill. Dep't of Nat. Res., 347 F.3d 1014, 1039 (7th Cir. 2003). Regarding supervisors, the personal responsibility requirement is satisfied if the constitutional deprivation occurs at the supervisor's direction or with the supervisor's knowledge and consent. Id. In other words, the supervisor "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." Id. (quoting Gentry v. Duckworth, 65 F.3d 555, 561 (7th Cir. 1995)). The record does not support a finding that Utter had personal involvement in the delay the plaintiff experienced in receiving care for his neck pain.

DeGroot and Stevens also lack personal involvement in the plaintiff's medical care claims. As an institution complaint examiner, DeGroot was responsible for investigating the plaintiff's inmate complaint allegations about not receiving treatment for his pain. DeGroot *did* investigate the plaintiff's allegations. And while DeGroot's recommendation to dismiss GBCI-2023-257 did not withstand the plaintiff's appeal of the conduct, that does not make DeGroot liable for the delay the plaintiff experienced. See Owens v. Evans, 878 F.3d 559 (7th Cir. 2017) (prison officials who simply processed or reviewed grievances lack personal involvement in the conduct forming the basis of the grievance). As warden, Stevens responded to two pieces of correspondence from the plaintiff regarding lack of medical care. Stevens referred the plaintiff to the

grievance process because the plaintiff was in the process of exhausting his administrative remedies. Stevens did not become warden at Green Bay until April 2023, which is the same month the plaintiff received his delayed cervical injection. DeGroot and Stevens cannot be held liable for failure to act outside the scope of their authority. See Burks, 555 F.3d at 595. They did not violate the plaintiff's constitutional rights.

The plaintiff also claims that he experienced unreasonable delay in obtaining treatment for his back pain. The record shows that for his back pain, the plaintiff was seen on August 17, 2021, October 21, 2021, January 24, 2022 and February 10, 2023. The plaintiff had a lumber spine x-ray on February 24, 2023, and he received physical therapy on October 21, 2021 and November 15, 2021. He also received a TENS unit to assist with sciatica pain that was in effect from November 1, 2021 through April 30, 2022, and from August 11, 2023 through August 10, 2024. He had pain medication, including acetaminophen and naproxen, during this time. The record does not support a finding that the defendants acted with deliberate indifference regarding the plaintiff's back pain.

The State defendants contend that they are entitled to qualified immunity because no case law clearly establishes that the care the plaintiff received was constitutionally deficient. Dkt. No. 110 at 29. According to the defendants, "[t]he opposite is true"—that is, "a disagreement between an incarcerated individual and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." Id. (quoting Pyles v. Fahim, 771 F.3d 403, 409 (7th Cir. 2014)).

Qualified immunity "protects government officials from suit for damages when their conduct does not violate clearly established statutory or constitutional rights." Pearson v. Callahan, 555 U.S. 223, 231 (2009). Determining whether a state official is entitled to qualified immunity involves two inquiries: "(1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation." Williams v. City of Chicago, 733 F.3d 749, 758 (7th Cir. 2013). If either inquiry can be answered in the negative, the official is entitled to summary judgment.

A constitutional right is clearly established if "the right in question [is] sufficiently clear that a reasonable official would understand that what he is doing violates that right." Lindell v. Pollard, 558 F. Supp. 3d 734, 744 (E.D. Wis. 2021) (quoting Weinmann v. McClone, 787 F.3d 444, 450 (7th Cir. 2015). "[T]he clearly established right must be defined with specificity." Id. (citing City of Escondido v. Emmons, ___ U.S. ___, 139 S. Ct. 500, 503, 202 L.Ed.2d 455, (2019)). The court should "analyze whether precedent squarely governs the facts at issue, mindful that [courts] cannot define clearly established law at too high a level of generality." Id. at 744-45 (quoting Strand v. Minchuk, 910 F.3d 909, 917 (7th Cir. 2018)).

The State defendants' contention that it is clearly established that a disagreement between an incarcerated individual and a medical professional about the proper course of treatment does not establish an Eighth Amendment violation does not accurately characterize the plaintiff's claim. The plaintiff has not alleged that he merely disagreed with his medical treatment; he claims that the defendants did not follow the specialist's direction that he should return to the clinic three to four weeks after his cervical epidural injection and that they

disregarded his repeated complaints about severe neck pain. The law is clearly established that ignoring instructions from a specialist can amount to deliberate indifference. See Zaya v. Sood, 836 F.3d 800, 806 (7th Cir. 2016) (citations omitted). The State defendants are not entitled to qualified immunity.

In summary, the court will deny defendant Trzebiatowski's motion for summary judgment, and it will deny the State defendants' motion for summary judgment as to defendants Kilmer, Henning and Cotton regarding the plaintiff's claims related to his neck pain. The court will grant the State defendants' motion for summary judgment as to defendants Utter, Bost, Baker, Yonash, DeGroot and Stevens and will dismiss those defendants. The plaintiff's surviving claims relate to the denial of and delay in receiving treatment for his neck pain from December 2021 through April 2023.

## III.  Plaintiff's Motions (Dkt. Nos. 141, 146)

On August 4, 2025, the plaintiff filed a motion to compel or for injunction. Dkt. No. 141. He asks the court to compel defendant Utter to produce a report from his rheumatologist and information about a knee brace that has been withheld from him. Id. at 1. The plaintiff states that these documents show he has suffered additional damage, and that he needs surgery. Id. at 2. The plaintiff's motion relates to discovery, and discovery has been closed for months. Also, a report from the plaintiff's rheumatologist and documents about his knee are not relevant to the merits of the plaintiff's medical care claims. The court will deny the plaintiff's motion to compel and for injunction.

On August 18, 2025, the plaintiff filed a motion for an extension of time to respond to the defendants' responses to his additional proposed findings of fact. Dkt. No. 146. The plaintiff states that the defendants objected to many of

his additional proposed findings of fact, and he wants to respond to their objections. Id. at 1. In effect, the plaintiff is asking to file a sur-reply, and the court's Local Rules do not provide for sur-replies. Cf. Pike v. Caldera, 188 F.R.D. 519, 537 (S.D. Ind. 1999) (noting that the United States District Court for the Southern District of Indiana has a local rule allowing for sur-replies when there are new arguments or evidence presented in a reply brief). The plaintiff did not file his proposed sur-reply along with his motion for an extension of time, but he did later file it on September 12, 2025. Dkt. Nos. 151-52. It relates to defendant Trzebiatowski's motion for summary judgment, which the court has denied. The plaintiff has not established that the court should permit him to file a sur-reply. But the court has reviewed the sur-reply, and it does not the change outcome of the court's ruling on Trzebiatowski's motion for summary judgment. The court will deny as moot the plaintiff's motion for extension of time.

## IV. Conclusion

The court **DENIES** the plaintiff's motion for summary judgment. Dkt. No. 73.

The court **DENIES** defendant Trzebiatowski's motion for summary judgment. Dkt. No. 93.

The court **GRANTS IN PART AND DENIES IN PART** the State defendants' motion for summary judgment. Dkt. No. 109. The court **GRANTS** the motion as to the plaintiff's claims against defendants Utter, Bost, Baker, Yonash (n/k/a Cervantes), DeGroot and Stevens. The court **DENIES** the motion as to the plaintiff's claims against defendants Kilmer, Henning and Cotton.

The court **ORDERS** that defendants Utter, Bost, Baker, Yonash (n/k/a Cervantes), DeGroot and Stevens are **DISMISSED**.

The court **DENIES** the plaintiff's motion to compel or for injunction. Dkt. No. 141.

The court **DENIES AS MOOT** the plaintiff's motion for extension of time. Dkt. No. 146.

The court **ORDERS** that the parties must appear for a telephone status conference on **October 27, 2025 at 3:30 PM** to discuss the next steps in the litigation. The parties must appear by calling the court's conference line at 551-285-1373 and entering Meeting ID 161 4901 8989 and Passcode 190021 when prompted. The court will make arrangements with the plaintiff's institution for his appearance at the hearing.

Dated in Milwaukee, Wisconsin this 30th day of September, 2025.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**